## McKEEN v. JERDONE.

PATENTS; PATENTABILITY; INTERFERENCE; CONCEPTION AND DISCLOSURE.

1. Although the various parts of a railroad car, such as the roof, the doors, the floor, the side construction, the draft rigging, etc., are related and co-operative to a certain extent, they are susceptible of improvement separately, and such improvements in these parts may constitute independent inventions and be patented accordingly.

2. Where an inventor employs another to embody his conception in a drawing or in practical form, he is entitled to any improvement thereon due to the mechanical skill of the employee (following *Milton* v. *Kingsley,* 7 App. D. C. 531; *Huebel* v. *Bernard,* 15 App. D. C. 510; *Gedge,* v. *Cromwell,* 19 App. D. C. 192; *Gallagher* v. *Hastings,* 21 App. D. C. 88; *Flather* v. *Weber,* 21 App. D. C. 179; *Sendelbach* v. *Gillette,* 22 App. D. C. 168; *Kreag* v. *Geen,* 28 App. D. C. 437; *Larkin* v. *Richardson,* 28 App. D. C. 471; *Robinson* v. *McCormick,* 29 App. D. C. 98, 10 A. & E. Ann. Cas. 548; and *Braunstein* v. *Holmes,* 30 App. D. C. 328) ; but, if the employee goes further than mechanical skill enables him to do and makes an actual invention, he is entitled to its benefit. (Following *Robinson* v. *McCormick,* supra.)

3. It is not invention to conceive the idea that a metal railway car is a thing to be desired; but there must be conception of the means by which the desired result can be obtained.

4. Where, in an interference involving improvements in steel car structure, it appears that the senior party, to whom was issued a patent containing forty-eight claims covering various parts of the car construction before the junior party applied for a patent, had been a draftsman and inspector of car construction in the employ of a railroad company of which the junior party was superintendent of motive power and machinery; that the senior party had been called upon to prepare, and did prepare, drawings for improvements in steel railway freight cars from the plans and crude sketches of the junior party; that, after the issuance of the patent, the junior party filed his application, and was put in interference with the senior party, and was thereafter awarded priority as to thirty-one of the forty-eight claims, and appealed from the decision awarding priority to the junior party as to the remaining claims; and where it also appeared that the seventeen claims covered specific details of construction of various parts of the car which were not shown in the drawings upon which the senior party had been engaged, or shown to have been communicated or disclosed to him by the junior party, it was *held* that the senior party was entitled to an award of priority as to such seventeen claims.

No. 582. Patent Appeals. Submitted November 12, 1909. Decided December 7, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case.	*Affirmed.*

The facts are stated in the opinion.

*Mr. C. H. Duell, Mr. F. P. Warfield,* and *Mr. H. S. Duell* for the appellant.

*Mr. E. T. Fenwick* and *Mr. L. L. Morrill* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

This is an interference proceeding involving priority of invention of improvements in steel car structure.

Francis Jerdone filed an application for a patent July 25th, 1906, which was issued December 4th, 1906. This patent contained forty-eight claims, covering a number of specific combinations. William R. McKeen, Jr., copied the claims in his application for the same invention filed March 9, 1907. McKeen was a highly educated mechanical engineer, who had begun work as a mechanic in railway shops, and risen to be superintendent of motive power and machinery of the Union Pacific Railway Company, and had held that position for some time prior to the date of his alleged invention, May 3, 1905. His office was in the railway office at Omaha, Nebraska. Jerdone was then an employee also. He had entered the service late in 1903 in the drafting department, but, some time prior to May 3, 1905, had become a general inspector of car construction. McKeen had invented a steel motor car and some other car structures, and in May, 1905, conceived the idea of developing a plan for constructing all steel railway freight cars. McKeen having made certain crude sketches and explained some ideas of his contemplated construction to Edmund B. Dailey, chief draftsman, and Arthur H. Felters, mechanical engineer, in the Omaha offices, Jerdone was called from his duty as car inspector to prepare drawings for the same. This new work began on September 13, and ended December 16 or 17, 1905. He had not quite finished his first drawing, when he returned to his regular duties, and another draftsman completed the work. McKeen claims to have conceived the entire invention before that time, and to have communicated his ideas to Jerdone, who merely executed the same. Jerdone claims that the invention patented to him is entirely different from that disclosed to him by McKeen, and his own independent invention, notwithstanding his relations with McKeen, who was his superior in the service of the railway company. The Examiner of Interferences stated the question involved, and grouped the claims as follows:

"The invention pertains to an art that is at this time well developed. Patents are being constantly granted on separate and independent parts of car structures. There is no particular

coaction between many of these parts, and it is difficult to conceive how a general plan of a car can be said to extend to all of its various parts unless these parts are, at least in a general sense, embodied in the plan. An examination of the patent to Jerdone shows that the claims are directed to the various parts of the car construction, and that several patents might have been granted, covering these various parts, had the applicant filed independent applications for these respective parts. In fact a careful examination of all the claims of the patent shows that the same are directed to no less than seven independent parts or features, for each of which a separate patent might have been issued. These are:

"(1) The structure of the side of the car including the bracing and door framing set forth in claims 1, 2, 3, 5, 6, 7, 19, and 37 to 48, inclusive;

"(2) The draft rigging, and the bracing in the bottom of the car, included in claims 4, 8, 9, 11, 14, 15, 16, 29, 30, 31;

"(3) The bolster construction, which includes claims 12 and 13;

"(4) The so-called queen post construction beneath the doors, which includes claims 20 to 25, and 32 to 36 inclusive;

"(5) The roof construction, which includes claim 26 only;

"(6) The floor construction, which includes claims 27 and 28; and

"(7) The corner post construction, which includes claims 10, 17, and 18.

"That these several inventions are independent of each other, in the sense that a patent might have issued for each, seems clear; for obviously the side framing, for instance, could be used with a floor of different type, and the bolster with a car having a different roof and floor construction. In cases like this, therefore, it is essential, in order that one party may prevail under the doctrine of employer and employee, that the employer shall include in his disclosed plan ideas which shall extend, generally at least, to each and all of the several independent features or improvements. Otherwise those parts of

which there is no proof of disclosure must be regarded as the independent inventions of the employee."

Then, after reviewing the evidence, he rendered a decision, awarding priority to McKeen of thirty-one of the claims in controversy which covered the structure of the side of the car, including the bracing and door framing, the draft rigging and the bracing in the bottom of the car, and the bolster construction. He awarded seventeen claims to Jerdone, covering respectively the queen post construction between the doors, the roof construction, the floor construction, and the corner post construction. Jerdone failed to perfect an appeal from the award, and is concluded thereby as to the thirty-one claims. McKeen appealed as to the remaining claims awarded to Jerdone. Those claims were as follows:

"(10) In a car structure, a sill, a door frame rigidly secured to the sill and comprising spaced door posts defining a door opening at the center of the sill, bolsters disposed beneath the sill adjacent its opposite ends, a truss bar rigidly secured to the sill adjacent the bolsters and extending at an inclination to and arched over the door frame, a corner post rigidly secured to the extremity of the sill and extending above and below the sill, and a brace secured to the lower extended end of the corner post and extending toward the middle of the car and rigidly secured to the sill."

"17. In a car structure, spaced side sills, a draft rigging disposed between the side sills and extending to the end of the structure, a supporting brace rigidly secured to the oblique braces and passing beneath the draft rigging, posts rigidly secured to the extremity of the side sills and extending both above and below the sills and braces secured to the lower extended ends of the corner posts and extending in an incline position toward the center of the structure and rigidly secured to the sills.

"18. In a car structure spaced side sills, braces rigidly secured to the side sills and extending obliquely relative thereto, door frames comprising spaced side posts secured to the sills and defining registering door openings centrally of the sills, truss bars rigidly secured to the side sills adjacent their opposite

ends and extending to and arched over the door frames, corner posts rigidly secured to the extremities of the sills and extending above and below the sills, braces secured to the lower extended ends of the corner posts and extending toward the center of the car and rigidly secured to the side sills, and a plate rigidly secured to the upper extremities of the corner posts and extending longitudinally of the car, and rigidly secured at its central point to the door frame and the truss bar."

"20. In a car structure, spaced side sills, a needle beam extending transversely between and rigidly secured to the side sills at the longitudinal middle, queen posts rigidly secured sills upon opposite side of the needle beam, and with inclined brace portions extending toward each other, and secured to the needle beam, and a truss rod rigidly connected with the sill and extending beneath the queen posts.

"21. In a. car structure, spaced side sills, bolsters extending transversely between and rigidly secured to the side sills adjacent their ends, a needle beam extending transversely between the side sills at their longitudinal middles, and rigidly secured to said sills, queen posts disposed beneath the side sills on opposite sides of the queen posts and having brace portions extending in reversely inclined position to and secured upon the needle beam, and a truss rod rigidly secured at its opposite ends to the bolsters, and extending beneath the queen posts.

"22. In a car structure a side door frame erected upon the side sill, and comprising spaced door posts defining a central door opening, queen posts rigidly secured to the said sill beneath the door posts, and provided with brace portions reversely inclined toward each other, and truss rods rigidly connected with the side sills adjacent their opposite ends and extending beneath the queen posts.

"23. In a car structure, spaced side sills, bolsters rigidly secured beneath the side sills adjacent their opposite ends and extending transversely relative thereto, a door frame erected upon the side sill and comprising integral spaced door posts arched at the top and defining a door opening centrally of the sills, a truss bar rigidly secured to the sills adjacent the bolsters, and

extending to and arched over the door frame, a needle beam disposed transversely of the sills and centrally of the door openings, queen posts rigidly secured to the side sills beneath the door posts and provided with brace portions reversely inclined extending to and secured upon the needle beam, and a truss rod rigidly secured at its opposite ends to the bolster and extending beneath the queen posts.

"24. In a car structure, a side sill, spaced queen posts secured to the side sill and having brace portions extending in reversely inclined positions and secured to the centre of the sill truss rods rigidly secured to the side sill adjacent their opposite ends and extending beneath the queen posts, means carried by the truss rod for engaging the opposite outer faces of the queen posts, and means carried by the truss rod beneath the queen posts for exerting tension upon the rod and posts.

"25. In a car structure spaced side sills, bolsters secured to and extending transversely of the sills adjacent their opposite ends, a door frame erected upon the side sill and comprising integral side posts, and a top arched portion defining a door opening centrally of the sill, a truss bar rigidly secured to the sills adjacent the bolsters and extending to and arched over the arched portion of the doorframe, a needle beam extending transversely of the car and centrally of the door openings, queen posts rigidly secured to the side sills beneath the spaced door posts, and provided with brace portions reversely inclined extending and secured to the needle beam, a truss rod rigidly secured at its opposite ends to the bolsters and extending beneath the queen posts, means carried by the truss rod for engaging and bearing against the outer opposite faces of the queen posts, and means carried by the truss rod between the queen posts for exerting tension upon the truss rod and the queen posts.

"26. In a car structure, spaced side plates, spaced arched carlines secured at their opposite ends to the said plates, and having upstanding flanges, a roof plate having its edges turned at right angles to the plate and curved to conform to the curvature of the car-lines, and with a curved portion formed along its longitudinal middle proportioned to cover one car line, a cap

covering one upstanding edge of the roof plate, and a flange of one car-line removable means for securing the cap upon the car-lines, and removable means for securing the intermediate curved portions of the roof plate upon the intermediate car-lines.

"27. In a car structure, spaced side lines, and a single center beam, transverse beams rigidly secured at their opposite ends to the center beam and the side sills, and arranged in pairs, floor plates disposed upon the transverse sills and having their opposite edges turned downward between the pair of sills, and means for clamping the downwardly turned edges of the floor plates between the sills.

"28. In a car structure, a center beam, and side sills spaced upon opposite sides of the center beam, transverse sills disposed between the center beam and the side sills, and having portions at each end turned at right angles and secured rigidly to the said center beam and sill, the said transverse beams being arranged in pairs, a floor plate disposed upon the transverse sills and having its edges turned at right angles to the plate and disposed between the pairs of transverse sills and with edges adjacent the sides of the structure turned upwardly, and means for clamping the downwardly turned floor edges adjacent the transverse sills."

"32. In a car structure, queen posts forming an arch beneath the center of the car.

"33. In a car structure, a side sill, queen posts disposed beneath the center of the side sill and provided with members forming an arch.

"34. In a car structure, a side sill, queen posts disposed beneath the sill and forming an arch, and a truss rod having its opposite ends connected with the sill and disposed beneath the queen posts.

"35. In a car structure, a side sill, queen posts disposed beneath the middle of the sill and provided with inclined portions extending toward each other and forming an arch, and means for supporting and exerting tension upon the queen posts.

"36. In a car structure, a side sill, spaced queen posts disposed beneath the middle of the sill, and having portions extending

along and secured to the sill, and with inclined portions extending toward each other and forming an arch, and means disposed beneath and to support the queen posts."

The Examiner-in-Chief affirmed the decision appealed from. McKeen then appealed to the Commissioner, who affirmed the decision of the Examiners-inChief; and he has taken a final appeal to this court.

All of the testimony in the record was introduced by McKeen. Jerdone, having taken no testimony, stands upon his office record and patent.

The first contention on the part of the appellant is that these seventeen counts should be awarded to him on the issue of priority merely, because they are not patentably distinguishable from the subject-matter clearly conceived by him and shown in certain exhibit drawings. We have already quoted the conclusion of the Examiner as to the independence of the inventions set forth in the appealed claims from those found to have been invented by McKeen. The Examiners-in-Chief expressed the same opinion, and so did the Commissioner. We make the following extract from his opinion on this point:

"The subject-matter in controversy, railway cars, belongs to a well-developed art in which inventors have specialized, and the various parts of the car have often become the subject-matter of separate patents. Although the various parts of a car, such as the roof, the doors, the floor, the side construction, the draft rigging, etc., are related and co-operate to a certain extent, they are susceptible of improvement separately, and such improvements in these parts may constitute independent inventions and be patented separately. While one inventor may, therefore, originate the general plan of a novel car for which he is entitled to a patent, and also specific constructions of the various parts which he may also cover, other inventors are likewise entitled to a patent protection for the invention of different specific improvements in the various parts."

We agree with the Commissioner's conclusion.

The substantial question in the case is whether McKeen had

these particular combinations conceived in his mind, and communicated them to Jerdone in order to have them worked out.

It is a well-established principle of the patent law that where an inventor employs another to embody his conception in a drawing or in practical form, he is entitled to any improvement thereon due to the mechanical skill of the employee. *Agawam Woolen Co.* v. *Jordan,* 7 Wall. 583–603, 19 L. ed. 177–182; *Union Paper Collar Co.* v. *Van Dusen,* 23 Wall. 530, 564, 23 L. ed. 128, 133; *Milton* v. *Kingsley,* 7 App. D. C. 531–537; *Huebel* v. *Bernard,* 15 App. D. C. 510–514; *Gedge* v. *Cromwell,* 19 App. D. C. 192–198; *Gallagher* v. *Hastings,* 21 App. D. C. 88–99; *Flather* v. *Weber,* 21 App. D. C. 179; *Sendelbach* v. *Gillette,* 22 App. D. C. 168–177; *Kreag* v. *Geen,* 28 App. D. C. 437–440; *Larkin* v. *Richardson,* 28 App. D. C. 471, 478; *Robinson* v. *McCormick,* 29 App. D. C. 98–108, 10 A. & E. Ann. Cas. 548; *Braunstein* v. *Holmes,* 30 App. D. C. 328–331.

But while an employer is to be protected from the bad faith of his employee, the employee is equally entitled to protection from the rapacity of his employer. If, therefore, he goes farther than mechanical skill enables him to do and makes an actual invention, he is entitled to its benefit. "To claim the benefit of the employee's skill and achievement, it is not sufficient that the employer had in mind a desired result, and employed one to devise means for its accomplishment. He must show that he had an idea of the means to accomplish the particular result, which he communicated to the employee in such detail as to enable the latter to embody the same in some practical form." *Robinson* v. *McCormick,* 29 App. D. C. 98–109, 10 A. & E. Ann. Cas. 548.

It remains to apply these principles to the facts disclosed by the record.

The history of McKeen's general purpose, as stated in the brief in his behalf, is substantially this:

Subsequent to the development of an all steel gasolene motor car, McKeen undertook in May or June, 1905, the design of an all steel box or freight car adapted to stand the severe conditions of practical railway traffic. He conceived certain novel ideas

whereby the weight of the car could be materially reduced without sacrifice of strength or stiffness. Broadly speaking, the members were to be so disposed and related one to another in the form of either struts or tension members so that the great strength of the metal in a longitudinal direction could be utilized and all binding stresses reduced to a minimum. A further idea was so to form the car that a shock or jar at any point would be communicated to the entire car and easily diffused throughout the frame, rather than met and resisted locally by the part receiving the same. It is then said: "Obviously these ideas were susceptible of various embodiments, and one thoroughly imbued with the teachings of their originator might readily vary their form of embodiment and nevertheless retain their essential advantages."

Founded on this statement, the contention of the appellant is outlined as follows: "After laying out this work, McKeen called in his subsidiary engineering officers (the witnesses Felters and Dailey) and disclosed to them his ideas. Jerdone was then assigned to the work of laying out the design of the car, as every confidence was reposed in his integrity, and as he had formerly done some work in car designing. This Jerdone, during his entire employment by the Union Pacific Railway, was not only in the department of, but was directly under the supervision of, McKeen; some of the time, it is true, he acted as inspector, supervising the construction of cars building for the railroad by other parties, and at other times he was employed in the drafting room on plans for cars built by the railroad itself. At all times his work was, however, subject to the supervision of McKeen, and he was under McKeen's orders. Prior to taking up the work on the subject-matter of this interference, Jerdone had been employed in the drafting room, then was again placed on some inspecting work, and then in the month of September, 1905, took up this all-steel box-car design, all of this work being under the supervision of McKeen. In December, 1905, his work on this design being somewhat unsatisfactory, he was again given inspecting duties in the supervision of the construction of cars by other parties. At the time Jerdone was taken from this

active work, the car, so far as its leading features were concerned, was laid out, but other draftsmen were called in to complete the work on the drawings and supply some minor details. The work was then submitted to the traffic department of the Union Pacific Railroad, and objection was made to certain features of the car having no relevance herein; as for example, the width and height of the door were believed to be insufficient for readily loading and unloading certain kinds of freight. This necessitated the remaking of the drawings, and, with delays of material, it was not until the summer of 1906 that actual work on the construction of the car, of which two slightly different forms were built, could be commenced. The working drawings of these two cars were respectively completed July 6th and July 28th, 1906; McKeen's exhibits Nos. 8 and 9 being reissued forms of these drawings, identical save in minor details."

The proposition of McKeen, before stated, assumes more than is warranted by the state of the art at the time that he conceived his designs.

Metal cars of various kinds were in use at the time and had been devised for the purpose of improving upon the old styles of cars in respect of weight, durability, and resisting strength. Many inventors had been at work upon the problems involved, and many inventions had been made in parts or features of such cars, consisting of novel members, and in arrangements or combinations of old members with new ones, tending to produce novel and useful results. McKeen may have had in contemplation the construction of a new and better car than any known, but invention does not lie in the idea of such a car as a thing to be desired; it lies in the conception of the means by which the desired result can be obtained. Consequently in order to claim the benefit of work done by Jerdone, independently of descriptions and sketches furnished by McKeen, the latter must show that he had in mind and communicated to the former some specific means of accomplishing his desired end, and that Jerdone's independent work consisted of nothing more than improvements thereon that might have been accomplished by any mechanic or designer skilled in the art. If the improvements

worked out and patented by Jerdone amounted to nothing more than this, it is immaterial whether he worked them out while in the employ of McKeen, or after he had left it. If, on the other hand, any of Jerdone's improvements were not mere mechanical improvements upon disclosures made to him by McKeen, but were something in addition and patentably different, then Jerdone is an independent inventor, and entitled to the benefit of his invention, notwithstanding he was in the employ of another at the time of the invention.

The Examiner of Interferences has found that thirty-one of the claims of Jerdone's patent were based on disclosures by McKeen, and has awarded priority in respect thereof to McKeen. He has found, also, that the remainder of these claims, seventeen in number, constitute independent invention, and has awarded them to Jerdone.

These seventeen claims embrace what has been called, first, the queen post construction; second, the floor construction; third, the roof contsruction; and fourth, the corner post construction. These will be considered in their order.

1. The queen post construction is a special arrangement of parts placed under the car between the door frames, and is intended, in connection with the truss rods, to support the center of the car. The queen posts are substantial continuations of the side posts of the car beneath the floor. Inclined brace parts extend from each queen post, meet under the center of the intermediate doorway, and are fastened to the beam at that point. A truss rod runs longitudinally and is fitted in a recess in each queen post. This rod is supplied with an ordinary turn buckle. When the truss rod is tightened the queen posts are lifted and forced toward each other so that the ends of the inclined braces are also lifted, and support the beam at the door center, which is the center of the car. Thus is formed what Jerdone describes as "a supporting arch for the center of the car structure." Nothing in anyway resembling this is found in the drawing on which Jerdone was engaged, which is exhibit 10 of the record. McKeen contends that this is shown in his later drawing, exhibit 9, which was made in July, 1906.

This was denied by the several tribunals of the Office. The Examiners-in-Chief say: "This truss feature disclosed by exhibit No. 9 appears to us to be entirely lacking in invention, since it is a mere broadening of a queen post. The plate is rigid from door post to door post. In the queen post construction of this interference, the lower ends of the post are adjustable towards each other, and by such adjustment the center portion of the arch may be raised and lowered. The members of the queen post form an arch, which is supported from the ends of the posts. No such capability of operation is disclosed in blue print No. 9." This conclusion seems to us to be quite reasonable, but the question is not material, since we agree with the tribunals of the office, that the evidence does not show that this drawing was ever seen by Jerdone, or that the ideas embodied in it were communicated to him.

2. The floor construction in exhibit No. 10—the completed drawing on which Jerdone worked—consists of sheets lapped and secured by rivets to the diagonal braces. Claims 27 and 28 cover an arrangement in which the edges of the floor sheets are turned down at right angles between cross sills, to which they are clamped or riveted. Exhibits 8 and 9—McKeen's later drawings—show the edges of his abutting sheets turned down and riveted together, but not between cross sills, as described by Jerdone. This difference has been held to be patentable by all the tribunals of the Office. Certainly it cannot be said to have been suggested to Jerdone by the drawing shown in exhibit 10. That the new construction was never communicated to Jerdone is apparent from the evidence of the chief draftsman, Dailey. While the drawings of exhibits 8 and 9 were first made in the summer of 1906, this new flooring feature was not incorporated therein until in the late fall of 1906. When asked, What draftsman applied to the original the matter of abutting and securing the floor sheets as shown in exhibits 8 and 9? he said: "I cannot say it was a draftsman. I believe the matter came up in the shops. I believe some man in the shop proposed turning the sheets down and abutting them." .This was done in the con-

struction of the two cars upon those plans, and long after Jerdone had applied for his patent.

3. The roof construction is set out in claim 26. As regards this, the Examiner of Interferences said: "It is admitted by McKeen that his exhibits fail to show the specific arrangement covered by this claim, and he does not claim to have made a disclosure to Jerdone in any other manner. He argues, however, that the claim which involves the specific means for uniting the sheets of the roof is directed to a construction similar to the joints of the side sheathing, with which Jerdone was familiar, and is a mere modification of the details under consideration when Jerdone was working upon the drawings. In this respect, however, the evidence fails to support his views. The seam or joint is a special one, and totally different from anything he has proved to have been disclosed to Jerdone. Jerdone must therefore be regarded as an independent inventor so far as the subject-matter of this claim is concerned." The Examiners-in-Chief concurred in this view, saying: "As to the roof construction of count 26, McKeen employed only the ordinary lap joint. There is no suggestion whatever of the subject-matter of the count." The Commissioner, concurring, said: "McKeen's construction is disclosed in his exhibit 10, and consists merely of an ordinary lap joint. Jerdone has a specialized construction very different from that of McKeen, or of the patent to Murray, cited by appellant." Upon examination and comparison of the drawings and the testimony relating thereunto, we concur in this conclusion.

4. What is called the corner post construction is included in the elements embodied in claims 10, 17, and 18. They call for corner posts of the car which extend some distance below the sills, and braces attached to the lower ends thereof, extending upward to the side sills and rigidly secured thereto.

We find nothing in the evidence to indicate that McKeen contemplated any such extension and bracing before Jerdone left the work. It is not shown in the earlier drawing (exhibit 10), or in either of the later ones of July 6 and 26, 1906 (exhibits 8 and 9). This was clearly an independent idea of Jerdone.

McKeen has been allowed the greater number of the claims of the Jerdone patent as additions or improvements ancillary to his disclosures, but the evidence fails to show that he is entitled to the appealed claims on the same ground. The decision will therefore be affirmed. It is so ordered and the clerk will certify this decision to the Commissioner of Patents.    *Affirmed.*