28 C.C.P.A.(Patents)

## CRAM v. WARNER.
### Patent Appeals No. 4385.

Court of Customs and Patent Appeals.
Jan. 6, 1941.

Francis G. Boswell, of Washington, D. C., for appellant.

Joseph W. Milburn, of Washington, D. C. (John A. Griesbauer, of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Examiner of Interferences awarding priority to the party Warner in an interference proceeding.

Two counts are involved, reading:

"1. A laminated wallboard of which the top lamina is composed of a plurality of uniformly spaced planks or panels, and molding strips intervening between the planks or panels, the molding strips being secured to the next under lamina and having their top faces in the same plane as the top faces of said planks or panels.

"2. A laminated wallboard of which the top lamina is composed of a series of planks or panels uniformly spaced with those at the edges of the board inset from said edges a distance equal to half the spacing between the planks or panels to provide rabbets at the edges, and molding strips intervening between the planks or panels and disposed in the rabbets of adjacent boards, the molding strips being secured to the next under lamina and having their top faces in the same plane as the top faces of said planks or panels."

The invention was described by the Examiner of Interference as follows:

"The subject matter of this interference relates to laminated wallboard which is constructed so as to give a plank or tile effect. The top lamina is grooved at appropriate intervals and molding is inlaid in the grooves with its surface in the same plane as the wallboard. Likewise whenever two panels are to be joined the adjacent edges of the panels are rabbeted and a molding strip is inlaid in the rabbet concealing the joint. .

\* \* \* \* \* \*

"The issue is limited to a construction of wallboard wherein the surface is routed out at intervals and the molding inlaid in these grooves, the second count additionally reciting a joint made by rabbeting the adjacent edges of contiguous panels and positioning a strip of molding in the rabbets thus concealing the joint."

It appears from the decision of the board that Gram contended before it that the meaning of the counts was different from that given them by the Examiner of Interferences and in Gram's brief before us there is argument to the effect that count 1 "is susceptible of a broader interpretation than that given to it" by the tribunals below, but the brief states, "However, the appellant is not relying on this broader interpretation of count 1. He believes that he has proven conception, in the spring of 1935, of an invention falling within the issue when given its most limited interpretation."

In view of this statement there appears to be no necessity for our considering the counts separately in an effort to differentiate them.

The basis of the decision appealed from is that of originality, it being held by both tribunals below that Gram derived the invention from Warner.

Gram is the senior party and a patentee, he having received patent No.

2,090,529, dated August 17, 1937, upon an application, serial No. 52,591, filed December 2, 1935. The application of Warner, serial No. 164,771, was filed September 20, 1937. Under such circumstances, the burden rested upon Warner to prove his case beyond a reasonable doubt. The interference was declared October 14, 1937.

In Gram's preliminary statement the approximate date of February 15, 1935, was claimed for conception and the approximate date of March 10, 1935, for reduction to practice, but before us no date earlier than April 1935 is claimed to have been established for him. Under the holdings below he was, in effect, denied any date for an independent invention of the subject matter, the holdings being that it was disclosed to him by Warner in August 1935.

It is unnecessary to recite in detail the claims embraced in Warner's preliminary statement.

Testimony was taken by both parties and the record is an extensive one embracing numerous documentary and physical exhibits.

A brief statement respecting the parties and their relationship is deemed proper at this juncture. Both appear to have had much experience as lumber salesmen. From the latter part of 1934 to June 1937 Gram was employed as acting sales manager for the Vancouver Plywood & Veneer Company (hereinafter referred to as the Vancouver Company) of Vancouver, Washington. Warner for a number of years was employed as a salesman of a composition wall board for a company referred to as the Wood Conversion Company, a subsidiary of Weyerhaeuser Timber Company. From April 1, 1935 to October 1, 1935 he was in the employ of Nicolai-Neppach Company, which was engaged in the planing mill business at Portland, Oregon. In November 1935 he returned to the Wood Conversion Company where he remained until he became connected with the Vancouver Company in May 1936. The parties seem to have first met in the fall of 1934 when Warner called on Gram at the instance of the latter's brother (who was at that time financially interested in the Vancouver Company) relative to securing a position as salesman. Thereafter Warner called on Gram at various times and it is Warner's claim that during a call in August 1935, while he was connected with the Nicolai-Neppach Company, he disclosed the invention to Gram. The brief on behalf of Gram states: "Beginning at the time of Warner's alleged disclosure to Gram, the activities of the two parties were thereafter joint."

It appears that in October 1935 the invention was installed in a home which had been entered in the "National Better Homes contest of 1935." In March 1936 Warner was offered a position by Gram as salesman of the wall board, which, about that time, began to be called "Art-Ply." The offer, after approval by the company officials, was accepted by Warner and he began work with the company in May 1936. In the fall of 1936 he made a sales trip to California which lasted for several months, and from January 1937 to the middle of July 1937 he made an extensive trip covering most of the country. Gram retired as sales manager June 10, 1937 and Warner succeeded him in that position. It appears that at the time of Gram's retirement Warner was in the eastern section of the United States and that he received a wire asking him to meet John B. Power, General Manager of the Vancouver Company, in Washington, D. C., on the evening of June 13, 1937. He did so and there received the tender of the position as sales manager, which subsequently he accepted. It also appears that he then learned for the first time of the pendency of Gram's application for patent, being informed of it by Power.

Further details of the relationship and association of the parties will be set forth later.

At this particular point it is proper to say that one of the contentions made before us on behalf of Gram is that the question involved herein is one of priority and not originality.

Inasmuch as Warner makes no claim of having established conception earlier than August 1935, it is apparent that if Gram did, in fact, make the invention earlier than that time he would be entitled to an award of priority, even though it should be found that Warner also made the invention independently and disclosed it to Gram as claimed. On the other hand, if Gram did not make the invention prior to Warner, and it should be found that it was not derived from Warner, questions relating to diligence, reduction to practice, etc., apparently would arise.

It seems logical, therefore, first to consider the record on behalf of Gram, notwithstanding his status as senior party and

the burden which rests upon Warner of establishing his case beyond a reasonable doubt. That Warner was deemed by counsel for Gram to have esablished at least a prima facie case is evidenced by the fact that Gram took testimony. The evidence on Gram's behalf consists of his own testimony and that of two witnesses, Taylor and Martin by name, who were connected with an establishment called the Gram Manufacturing Company, located at Portland, Oregon (just across the Columbia River from Vancouver, Washington), Taylor as vice president and Martin as factory foreman. Certain exhibits, both documentary and physical, were also introduced in evidence.

The Examiner of Interferences reviewed the evidence adduced on Gram's behalf in great detail and arrived at the conclusion that it failed to establish conception by him prior to August 1935, the time claimed for Warner. The board likewise reviewed it and concurred with the Examiner of Interferences. In its decision the board said:

"The party Gram contends that he conceived of the invention in February 1935 and discussed it with DePenning then connected with the Vancouver Company, but who is now dead. He also discussed it with Taylor who was connected with another company engaged in the lumber business. Apparently his reason for consulting Taylor was for the purpose of having made molding strips of approximately ⅛" thickness. It seems that at this time molding strips were not made of less than ¼" thickness and it was difficult to find any one who would undertake the job of making them thinner. The witness Taylor urged Gram to wait until the return of the witness Martin before undertaking the job, and it appears from the record that they made up 600 or 700 feet in the latter part of April or early May 1935 and that thereafter Gram, with the aid of DePenning constructed a small model which was later lost, but of which Gram's Exhibit 7 is alleged to be a replica. Nothing further was done until in August when Gram and Warner had a conference at which time the improvement was discussed.

"The Examiner of Interferences has held that the corroborating witnesses, Taylor and Martin, fail to substantiate Gram's testimony that he disclosed to them the subject matter in issue. The testimony of these two witnesses on this point is very brief. Taylor's testimony on this point reads as follows:

"'Q. 6. State whether or not at that time he explained to you, by rough drawings or otherwise, what he was trying to do. A. 6. He did, yes, sir.

"'Q. 7. And what was that? A. 7. Trying to make a molding to make the effect on plywood panels have a plank effect to it as well as cover the joints. (Gram's record, P. 176).'

"While this testimony does tend to indicate that Gram was trying to produce a plywood board having a panel effect, still it is not clear that he accomplished this by placing the molding in grooves cut in the face of the plywood as called for in the counts. His language would apply equally well to a sheet in which the moldings were applied to the surface as well as in grooves cut in the board.

"Also in Martin's testimony which reads as follows:

"'Q. 22. Did he show you the plywood board? A. 22. No, he didn't show me a piece of plywood at the time, but he did by a drawing show me how he intended to groove out the plywood and lay this molding in.'

"It is not clear as to just how the molding was to be arranged on the face of the plywood.

"We are of the opinion that the Examiner of Interferences was right in assuming that Gram has failed to prove that he was in possession of the invention prior to his conference with Warner in August 1935."

We have studied the Gram record most carefully and we are unable to agree that the analyses made by the tribunals below and the conclusion there reached respecting conception by him were erroneous. The testimony specifically cited and quoted in Gram's brief adds no strength to that cited and reviewed in the decisions below.

Since the question is one of fact, no useful public purpose would be served by a further review of that testimony in this decision.

We next consider the matter of Warner's conception of the invention. We say "conception" because, so far as we are able to determine from the record, the first actual reduction to practice of it (without reference to whose invention it was) occurred in October 1935 when the material

was installed in the home which had been entered in the "National Better Homes contest of 1935," above alluded to. It should be said, however, that neither of the tribunals below made a finding with respect to actual reduction to practice by either party. Evidently they did not regard it necessary to do so in view of their conclusion that Gram derived the invention from Warner. Obviously, it was their view that any actual reduction to practice which took place was of the conception of Warner.

The discussion of Warner's conception by the tribunals below, as a matter standing alone, is not very extensive. In the decision of the Examiner of Interferences it was said:

"Warner testifying in his own behalf avers that he conceived the invention in August, 1935, and that he had Chirgwin make two samples of his idea of which exhibits 2 and 3 are replicas the originals having been lost.

"Chirgwin corroborates Warner in this allegation and states that Warner came to him with the idea in the summer of 1935 (XQ. 42, page 92) and that samples like exhibits 2 and 4, with the exception that screen molding was used, were made (Q. 12, page 88).

"Subsequent to the making of these first models Warner states that he went to Gram who was then employed by the Vancouver Plywood and Veneer Company * * * and explained the invention to him. The sales possibilities of this new type of wallboard were discussed with Gram as well as Power the General Manager of the company. Gram turned Warner over to Carlson who was foreman of the Vancouver Company shopping plant, and several more samples were made as well as full size 4' x 8' panels."

The board said: "The junior party alleges that he made the first drawings of his invention in May 1935 and to have explained the invention to others in August 1935. He originated the invention while in the employ of the Nicolai-Neppach Company and engaged the witness Chirgwin an employee of that Company to assist him in making up specimens. These original specimens were lost but it is alleged that his Exhibits 2 and 3 are replicas of the originals and it is clear that Exhibits 2 and 3 clearly show the invention which is covered by two counts * * *."

It will be noted from the above that while the board held that exhibits 2 and 3 clearly show the invention, it did not hold that they were in fact replicas of, but merely stated that they were alleged to be replicas of the originals which had been lost.

In the reasons of appeal to us Gram asserts that the Board of Appeals erred: "* * * In apparent acceptance of Warner's Exhibits Nos. 2 and 3 as 'replicas' of his alleged original specimens."

There is, however, no specific reason of appeal which challenges the award of conception to Warner in August 1935, nor is there any contention before us that such award constituted error. There is a statement in Gram's brief that: "If Warner independently conceived the invention or had more than a vague idea of giving plywood wallboard a panel or tile effect which is possible but not probable, he certainly abandoned the invention."

So far as we can determine, the question of abandonment thus suggested was not raised before either of the tribunals below, nor is there any assignment which covers it in the reasons of appeal before us. If in fact Gram derived the invention from Warner the question of abandonment by Warner would seem to require no consideration here even if error had been assigned, and it may be further remarked that if the installation made in October 1935 was of wallboard, the invention of which was the conception of Warner and not of Gram, such installation being a reduction to practice, seemingly would eliminate any issue as to abandonment even though it should be found that Warner did not disclose the invention to Gram.

Leaving aside for the time being the question of originality the following situation is presented.

In October 1935 there was a reduction to practice of the invention defined in the counts and Warner (who personally installed the wallboard) is the only party entitled to an award of conception prior to that time, treating him as an independent inventor. This situation of itself normally would seem to entitle Warner to an award of priority without reference to the matter of originality. However, neither of the tribunals of the Patent Office specifically so held, and in view of the basis of their decisions—originality—we feel it incumbent upon us, under our statutory jurisdiction

and duty, to consider and pass upon the latter question.

At the time Gram was first employed as sales manager by the Vancouver Company in 1934 the stock of that company (as a result of a reorganization of a predecessor company) belonged to certain individuals (including a brother of Gram) who subsequently, some time in 1935, sold it to two parties—Snyder and Kilworth, by name. Snyder became president and Kilworth vice president of the company. One A. B. Ridgway became secretary of the company and also its general attorney prior to the sale to Snyder and Kilworth and continued as such thereafter. Gram remained as sales manager until June 10, 1937. During the taking of the testimony Ridgway appeared in the case in the double capacity of attorney for Warner and witness in his behalf. Snyder and Kilworth also appeared as witnesses for Warner. In addition to these there were other witnesses who gave testimony having a bearing upon the question of originality, among whom were John B. Power, general manager of the company, and John C. O'Brien, superintendent of the company's plant.

Warner, testifying in his own behalf, stated with much positiveness that he made disclosure and explanation of the invention to Gram in August 1935, and this was not denied by Gram, his contention being, as already, stated, that he had conceived it before that time. The general purport of the testimony of the officials and employees of the company above named was to the effect that Gram referred to the wallboard as "Warner's idea," and that they thought of it as such.

In its decision the board quoted testimony of Gram bearing upon the point and commented thereon as follows:

"'Mr. Neal: Question 103. Did you ever tell Mr. Power, or Mr. Kilworth, or the other gentlemen who testified in this interference who are employees or officers of the Vancouver Plywood & Veneer Co., that this idea disclosed in your invention was Warner's idea?

"'Answer 103. No, not in that sense. I did say that Warner was enthusiastic about the sales possibilities, and he said he could sell the entire production of the plant if we could make it in this new type of wallboard, and it was always my policy to give my subordinates all the credit I could for things and to encourage them, and in that respect I may have referred to it as Warner's idea at different times in that sense.'

"This testimony is not convincing. It appears from the record that the party Warner was not familiar with the filing or prosecution of patent applications and it is probable that he relied upon the Vancouver Company officials to look after this part of the work, and it was only after he learned of the filing of the Gram application that he became acquainted with his rights as an inventor. * * *"

We do not deem it necessary to rehearse all the testimony bearing upon this point. We recognize the force of the argument in Gram's brief that the present attitude of the different officials of the company in contending that Warner was the actual inventor is an anomalous one in view of the fact that they had knowledge of the application filed by Gram in his own name and that the company itself paid the initial fees incident to its filing and prosecution.

The witness Snyder, for example, testified:

"X-Q. 49. You knew that Mr. Gram was making or had made application for patent? A. We told him to.

"X-Q. 50. You told him to? A. Yes.

"X-Q. 51. And I believe you testified, if I didn't misunderstand you, that you understood it was Mr. Warner's idea? A. Absolutely.

"X-Q. 52. And still you told Mr. Gram to file for a patent in his name, did you? A. We did."

The record does not disclose whether the Vancouver Company claims or proposes to claim any right in any patent that may be granted to Warner. Apparently, rights were claimed in the Gram patent and an effort to have Gram assign it was made prior to the filing of Warner's application.

The admitted attitude of those officials of the company in encouraging, even directing, the filing of an application by Gram for a patent upon an invention which they now declare was, in their opinion, the idea of Warner does not place them in a favorable light, so far as this court is concerned, and their testimony upon this particular point has had no influence upon our decision. That attitude, however, does not affect facts otherwise proven, and the company's rights and equities are of no concern in this proceeding.

One matter to which the tribunals of the Patent Office evidently gave much weight

was the contract made with Warner when he was employed as salesman. Its terms were suggested by Gram as sales manager and approved by the officials. By its terms Warner was to receive a fixed salary per month with traveling expenses and, in addition thereto, what was at first referred to as a commission, or bonus, on all sales of the wallboard whether made by Warner himself, or by other salesmen, or sold directly from the company's plant. It appears that beginning with January 1, 1938, these payments began to be designated on the company's books as "royalties." It will be observed that the latter date was subsequent to the issuance of the patent—August 17, 1937—and, it may be added, subsequent to the declaration of the interference—October 14, 1937. The change in designation from "commission," or "bonus," to "royalty," on the books of the company, appears to have been made at the suggestion of the attorney Ridgway. The record shows that Warner received the commissions referred to while employed as salesman and continued to receive them after he had become sales manager, but the record does not show whether it was contracted, or contemplated, that he receive them during the life of the Gram patent should it survive the seventeen-year period.

The contention on behalf of Warner, of course, is that the foregoing evidences recognition of himself as the actual inventor.

We do not regard the fact that commissions were paid Warner in the manner described as conclusive, in itself, that he was recognized as the actual inventor, but it is a circumstance to be considered along with the other facts and circumstances appearing.

■ Either Gram or Warner made the invention which is at issue. There has been no suggestion that they were joint inventors, although after a certain time they worked in unison in developing the wallboard commercially. It cannot be held, upon the record, that Gram conceived it prior to his conferences with Warner, beginning in August 1935, nor is there any evidence that Gram independently conceived it thereafter. It was held below, and we concur, that Warner proved conception in August 1935. So, upon all the facts appearing, we are of the opinion that derivation of the complete invention from

Warner by Gram admits of no reasonable doubt.

The decision of the Board of Appeals is affirmed.

Affirmed.