38 C.C.P.A. (Patents)

RONAY v. HEDIGER.

Patent Appeals No. 5762.

United States Court of Customs and Patent Appeals.

May 8, 1951.

Bernard Wohlfert, Washington, D. C., for appellant.

William H. Webb and Webb, Mackey & Burden, Pittsburgh, Pa., for appellee.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Judges.

O'CONNELL, Judge.

The junior party, Ronay, appeals here from the decision of the Board of Interference Examiners of the United States Patent Office, awarding priority to the senior party, Hediger, on the issue of originality, with respect to an invention which relates to a hollow, spray-coated, ceramic electrode for use with arc heating apparatus, especially an electric arc torch designed for underwater cutting on the hull of a ship.

The device, which is not complex, has been sufficiently defined by the counts in issue, 1–9, of which count 6 is illustrative: "6. An electrode for electrical arc heating apparatus comprising an elongated main body of siliconized silicon carbide, said main body having an aperture longitudinally therethrough for the passage of gas, a sheath of appreciable thickness made of metal on said main body covering and tightly embracing the body for at least a substantial portion of its length, the sheath being so positioned as to allow direct electrical contact with the electrical connecting means for the electrode, said sheath constituting a low-resistance path for the current from the electrical connecting means for the electrode to a point substantially at the working end of the electrode where the arc is formed."

The interference involves the patent No. 2,398,427 issued to The Carborundum Company, April 16, 1946, as assignee of Hediger, on an application filed by him on September 3, 1943; and the application of Ronay, Serial No. 725,177, a welding engineer employed as a supervisor at the United States Naval Engineering Experiment Station at Annapolis, filed January 30, 1947. Ronay's application is subject to his stipulation that when and if a patent is granted, the United States Government will have exclusive use of the device and no royalties thereon will be collected by Ronay.

There is no dispute that Ronay must prove his case beyond a reasonable doubt. Both parties took testimony, filed briefs, and were represented at final hearing. All of the witnesses were cross-examined by opposing counsel.

The record discloses that in the early part of 1942 Ronay, to meet a serious war emergency, was endeavoring as chief of the welding laboratory of the Naval Station to develop an arc-oxygen cutting device of the character hereinbefore described for cutting plates of steel under water; that he tried hollow metallic electrodes at first but, due to the excessive heat necessary to burn a large mass of metal under water, such as the hull of a ship, the metal electrodes were consumed too rapidly.

The record further discloses that Ronay then conceived the idea of using a nonmetallic electrode material of high melting point and reasonably high electrical conductivity, which material would not be subject to as rapid oxidation as any metallic alloy, and which would consist of a ceramic, such as Globar, identified as a silicon carbide product, manufactured by the Carborundum Company, and known to Ronay, who had previously used Globar in other operations having a similar purpose.

The operation of the device defined by the counts was described succinctly by the board as follows: "In using a cutting torch of the present type an electrical connection is made to the metal sheath of the electrode defined in the counts by means of a holder and a source of oxygen supply

is attached to the central bore of the electrode. An electrical connection is also made to the metal which it is desired to cut. After an arc is struck between the electrode and the metal, such as a hull of a ship, oxygen is fed to the arc causing considerable heat to be generated. The metal is thus oxidized at the point of heating or blown out of the cut as molten metal. * * * "

The gist of the development in issue here had its inception about March 3, 1942, on which date Ronay prepared a sketch, Ronay Exhibit 1, signed by Cyril D. Jensen, Ronay's working foreman in the Naval Welding Laboratory, and now Professor of Civil Engineering, Lehigh University, as witness. With respect to Ronay's sketch hereinbefore described, Jensen testified in response to questions propounded by Mr. Wohlfert, of counsel for appellant:

"Q. 13. Now, referring to the sketch, can you explain what your understanding of the construction was at the time this sketch was shown to you by Mr. Ronay? A. He conceived a pistol-like torch, thinking of the convenience of the diver, that had a ceramic tip and had connections for introducing both electricity and oxygen, the oxygen to go through a tube in the electrode. As conceived, an arc would be maintained under water and a jet of oxygen would impinge against the metal, probably steel, and the result would be a cut somewhat simulating the oxyacetylene method of cutting in air, except that the electricity forms the heating element instead of the oxyacetylene flame.

"Q. 14. I note on the sketch what appears to be screw thread sections or members. Could you explain what those are and what their purpose is? A. The ceramic electrode that he conceived has the ability to carry electricity, but not too well, and he wanted the brass casing—I think it is brass that he had in mind—to cover down near the tip of the electrode, so that the electricity would have a minimum of distance to travel through the electrode. Also, the casing served to secure the electrode and, presumably, to strengthen it.

"Q. 15. Could you explain why the casing was made in sections? A. As the electrode was consumed, the sections could be taken off one by one, thus maintaining a short distance between the casing and the tip.

"Q. 16. The electrode, I gather, is the cross-hatched elongated member positioned within the sectionalized casing? A. That is correct.

"Q. 17. Would you repeat what the understanding was concerning the nature of the electrode, what material was intended to be used? A. He was acquainted with the ceramic, with the D–2 Globar, because he had used it on some other experimental work. He was acquainted, therefore, with the refractory properties of it which would cause it to be consumed at a very low rate, and he was also acquainted with the electricity carrying properties of it. I should say electrical conduction, would be a more graceful term.

"Q. 18. Were any steps taken to obtain electrodes of this type and to test the operation of them? A. Yes, * * *."

Accordingly, on March 5, 1942, the following letter was dispatched by Ronay through the Naval Station to the Carborundum Company:

"Subject: Nonmetallic Electrode Element—

Request for information on.

"Globar Division,
"The Carborundum Company,
"Niagara Falls, N. Y.

"Gentlemen: The Station is developing an electrical device of an emergency nature which requires a nonmetallic electrode in the form of a tube whose length may vary from 6″ to 14″, its diameter from ½″ to 1″ and the bore from 0.25″ to 0.375″ in diameter. The electrode should have approximately the same electrical and physical properties as those of the grip ends of Globar elements.

"Information is requested whether you have any standard product which may fulfill the above given requirements and if not, your cooperation is sought to fabricate samples as soon as practicable.

"It is suggested that in order to become familiar with the problem on hand you authorize your technical representative located most conveniently to Annapolis to call at the Station at his earliest convenience to confer with the personnel of the Welding Laboratory to whom the task has been assigned.

"Yours very truly,
"C. C. Ross
"*Captain, U.S.N. (Ret.)*,
"*Acting.*"

In response to the foregoing invitation, Regional Engineer Barba of the Carborundum Company came to the station March 17, 1942. Afterwards the company shipped to the station sample rods or electrodes made of Globar, perhaps a score or so, which after being tested there were regarded as too large. Accordingly, on May 28, 1942, Ronay requested additional samples of Globar of a different size:

"Subject: Silicon-Carbide tubes for under-water cutting. KES Test B–7033.
"Globar Division,
"*The Carborundum Company,*
"*3111 West Allegheny Ave., Philadelphia, Pa.*
"Attention: Mr. C. E. Barba.

"Gentlemen: The silicon-carbide tubes furnished by you have shown some promise as electrode material for under-water cutting of steel when used with an oxygen stream. However, the results obtained indicate that better performance should be expected from tubes of ½" diameter by 6" long and containing a ⅛" bore.

"It is requested, therefore, that the Station be informed of the feasibility of furnishing six silicon-carbide tubes of the above given dimensions, stating the unit price and the approximate delivery date of same.

"If you find it desirable, it is suggested that your representative call at the Station at your early convenience to consult with the Station personnel before providing the above given new size tubes.

"Yours very truly,
"C. C. Ross,
"*Captain, U. S. N. (Ret.)*,
"*By direction.*"

The foregoing letter established that the original shipment of Globar rods, when subjected to tests in the Naval Laboratory, showed promise, but that better performance was expected from the smaller rods therein ordered. The letter disclosed for the first time also the use to which the rods were to be put.

Thereafter Barba, on June 9, 1942, delivered the smaller rods, but when tested the breakage continued to be at too high a rate, due to the arcing between the sleeve and rod, which caused the exposed end of the rod to crack off. Ronay reported progress but again appealed for further suggestions in the following letter of July 8, 1942:

"Subject: Silicon-Carbide Tubes for Under-Water Cutting of steel—E. E. S. Test B–7033.
"The Carborundum Company
"*Globar Division,*
"*3111 West Allegheny Avenue,*
"*Philadelphia, Pa.*
"Attention: Mr. C. E. Barba.

"Gentlemen: The ½" diameter silicon-carbide, ⅛" bore electrodes which you furnished for experimental purposes in connection with oxy-arc under-water cutting show a promise of usability. During cutting, while the arc is sustained and oxygen flows through the tube it performs in an acceptable manner. However, upon breaking the arc and shutting off the oxygen flow, the tip of the electrode, which is incandescent during arcing is left exposed to the quenching action of water. Apparently, then it shatters and when it is attempted to restart the arc by tapping against the steel target it breaks off.

"In order to render the subject material useful for the purpose intended, the above given behavior must be remedied.

"Further experiments are contemplated with one electrode which will be sheathed with a nonmetallic insulating sleeve intended to prevent the drastic quench following the extinguishing of the arc. Another experiment will use an unprotected electrode which will be heat treated by stress relieving or annealing in the belief that the present behavior of the material is the effect, at least partly, of the presence of

locked in stresses which become superposed on those which develop on quenching.

"Your comments are requested in regard to the above-given procedures, particularly concerning the optimum heat treatment for removal of the locked in stresses in the event that you concur in regard to the existence thereof.

"Yours very truly,
"C. C. Ross,
"*Captain USN (Ret.),*
"*By direction.*"

The idea of annealing the rods for the purpose of imparting additional strength and sufficient hardness to them was, among other things, thus introduced by Ronay. With respect to that and the other further experiments contemplated and performed by Ronay, the board properly held: "These heat treated, or annealed, rods were tested on August 12, 1942. Some of these rods were coated at the Station with insulation and some partially encased in different kinds of conductors. Ronay instructed Jensen [his assistant and foreman] on August 29, 1942, to order the shop to produce some Globar rods spray-coated with phosphor bronze. Tests on these rods, some of which were coated their entire length and others only portions of their length, were run on September 5, 1942. Ronay was so impressed with the results of these tests that he filed an application [for a patent] shortly thereafter. Under these circumstances we are of the opinion that the tests of September 5, 1942, were sufficient to prove an actual reduction to practice of all the counts in issue."

Spray-coating, a service for which the Naval Station had been equipped and had rendered, is a process for metal plating a substance whereby molten metal is coated or painted thereon by spraying under air pressure. The metallic covering thus applied increases the electrical conductivity and imparts mechanical strength to the frangible carbide.

The Carborundum Company also had such a spray-coating service, and the crux of the case resides in the point as to which of the parties to the interference added that final touch of spray-coating to make the electrode completely effective.

The documentary proof submitted with reference to the spray-coating by Ronay is set forth not only in the handwritten tabulated notes of September 5, 1942, in the diary of Jensen, but also in the subsequent letter from Ronay, through the Naval Station, to the Carborundum Company, dated September 10, 1942, Ronay Exhibit 2, in which Ronay inclosed a drawing fully disclosing the subject matter of all the counts in issue.

The idea of spraying Globar rods with metal, and the originator thereof, was discussed in the record by Jensen, among other things, as follows, italics being here supplied:

"By Mr. Harlan [counsel for the Carborundum Company and for the party Hediger].

\* \* \* \* \* \*

"X–Q. 13. Now, you state that Mr. Ronay disclosed to you the idea of spraying globar rods with metal, and you connect that in your mind with the instructions which you gave for spraying rods with metal as shown by Ronay's Exhibit 13, which I just showed to you. Did Mr. Ronay specifically tell you to spray two rods with a phosphor bronze coating and one rod with copper, one rod with aluminum, and two rods with nickel? A. Yes, that is correct. It would have normally taken place in conference where we jointly agree on it, but actually it came as instructions from Mr. Ronay.

"X–Q. 14. You say it would normally have taken place in conference. Do you mean by that that this was an abnormal occurrence? A. No. We would sit down together and he disclosed the possibility of spraying. Then we sat down together and figured out our procedure for attacking it.

"X–Q. 15. That would, as I understand you, be the normal way of doing it. But you have implied that there was something abnormal about this specific occurrence. What was abnormal about that? A. I am sorry. I don't recall anything abnormal about it. It was our standard procedure to

do that. And I have every reason to believe. that this followed the pattern.

"X–Q. 16. Well, then, you do not remember specifically the conditions under which you received the idea from Mr. Ronay? A. I am sorry—there was something abnormal. I use 'abnormal' meaning below normal. That is my mistake. *I knew nothing about spray coating and therefore this was an unusual suggestion. We had been fighting with the problem of trying to reinforce the globar electrodes. We had tried fiber sleeves and brass sleeves, and this idea of spraying just couldn't come to me because I knew nothing about it. And then when the suggestion was made, it rather stuck in my mind.*

"X–Q. 17. Well, how was the suggestion made? Did Mr. Ronay come up to your desk and tell you or was it made in a conference? A. No, it was made at his desk.

"X–Q. 18. Just casually while you happened to be there or did he call you over? A. *He called me into his office and we were discussing our problems, and he said, 'Let's try spray coating.'*

"X–Q. 19. *Now, was this on August 29 that this took place? A. I would practically guarantee that it would be August 29. It could conceivably have been the day before, but I wasn't one to waste time. If I had a good idea, I usually proceeded right away and scheduled the work.*"

On September 25, 1942, a year prior to the filing date of the Hediger application, Ronay requested the Judge Advocate General of the Navy to apply for a patent covering the subject matter of the counts in the name of appellant as the inventor thereof. The application was subsequently filed and appellant made the oath therein that he was the inventor.

The filing of Ronay's application was delayed until approximately nine months after the patent involved in the interference had been issued as hereinbefore described, the application having been placed in the Navy files in the belief that the invention was not patentable over the disclosure of certain prior art.

It is conceded that the subject matter of the counts was reduced to actual practice by Ronay almost a year prior to the filing date of the application on which the ·patent to Hediger was granted. It must be further conceded that the evidence presented on behalf of Ronay, oral and documentary, constitutes beyond any reasonable doubt a prima facie case of Ronay's prior conception and disclosure to Hediger, or his assignee, of the invention defined by the counts.[1]

Hediger has rested his case on the basis that all of the tests and further work embodying the subject matter of the counts done by Ronay and Jensen on and after August 29, 1942, inure to the benefit of Hediger on the ground that Ronay derived the invention from Hediger through Barba, by Hediger's furnishing to Barba, on or about July 17, 1942, six spray-coated Globar rods to be tested, and which were so tested, by Ronay at the Naval Station prior to August 29, 1942.

The record shows that in response to the letter of July 8 from Ronay, hereinbefore quoted, Barba had visited the station on July 13, and then had a talk with Jensen and perhaps with Ronay also, with respect to the subject matter of Ronay's letter and the difficulties reported therein. The discussion centered about the hope of being able to stiffen or strengthen the electrode beyond the point where the elec-. trode extended out of the electrode holder. On direct examination by Mr. Webb, Mr. Barba testified:

"169DQ. Now what did you do after this visit to the Experiment Station in July of 1942? A. I think I went to placès elsewhere for a couple days and then came to Niagara Falls. I was there on the 13th of July at the Experimental Station, and on the 15th and 16th I was in New York, and on the 17th I left New York for Niagara Falls where I stayed four or five days.

---

1. Gram v. Warner, 116 F.2d 502, 28 C.C.P.A.,Patents, 810; Foster v. Antisdel, 14 App. D.C. 552.

"170DQ. Did you talk to Mr. Hediger at any time on this visit? A. Yes, I did, Mr. Hediger and Mr. Courter.

"171DQ. Who is Mr. Courter? A. Well Mr. Courter is the Sales Manager for the Globar Division.

\* \* \* \* \* \*

"177DQ. What was said by you at that meeting? A. Well I explained the vital importance of trying to assist Mr. Ronay in getting electrodes that would function properly and I described the troubles we had been having at the Station with these electrodes and described the breakage and the apparent type of breakage we were getting down there and I asked for a solution.

"178DQ. What did Mr. Hediger or Mr. Courter have to say about the matter? A. Well Mr. Hediger expressed the thought we were getting too much localized current on the electrode at the point where the electrode left the holder and was exposed, and suggested that we coat the whole electrode the entire length with metal to carry the current throughout the length of the electrode.

"179DQ. Was anything done by Mr. Hediger at all about the date of that meeting in order to prepare rods embodying the suggestion which he had made? A. Yes.

"180DQ. What was done? A. He took some rods we had left from a previous run and had them spray-coated with metal. I do not recall the thickness of the spray, but coated them throughout the entire length.

"181DQ. Approximately how many rods were spray-coated at that time? A. I think perhaps six. I do not recall exactly.

"182DQ. What was the metal that was used? A. I think we used two or three metals. Copper, monel and brass.

"183DQ. Now these rods that were spray-coated were the so-called D-2 rods, were they? A. Yes.

\* \* \* \* \* \*

"190DQ. What was done with these rods that were sprayed on July 17, 1942? A. My recollection is that when I finally got back to the Philadelphia office I had the warehouse pack them and ship them to the Experiment Station.

"191DQ. You took the rods with you to Philadelphia? A. I took some of them with me.

"192DQ. Who had those rods coated in July of 1942, did you do the coating or issue the instructions for the coating or was that Mr. Hediger? A. Mr. Hediger.

"193DQ. Do you know who actually carried out the coating of the rods or the man under whose direction and supervision the coating was carried out? A. Mr. Pfaffenbach.

"194DQ. Now what did you do with the rods or electrodes that you took back to Philadelphia? A. I had the Philadelphia warehouse pack them and ship them down.

"195DQ. Ship them down to where? A. The Experiment Station.

"196DQ. And to whose attention were they addressed? A. I think to Mr. Ronay's attention.

\* \* \* \* \* \*

"204DQ. Did you follow up those electrodes? A. Yes.

"205DQ. What did you do? A. I was down to the Station on the 29th of August and I stopped in to see Mr. Ronay to follow through on the performance on these new rods.

"206DQ. Who did you see at that time? A. My records show I saw Mr. Ronay and Mr. Jensen.

"207DQ. Your diary, referring to August 29, 1942, shows it, does it? A. Yes, that was on a Saturday.

"208DQ. All right, did you ask Mr. Ronay or Mr. Jensen, or both of them, whether they had received the rods and what was done with them? A. Yes, I did.

"209DQ. Well tell us as best you can recall what was stated by you and what was stated by either Ronay or Jensen or both of them at that meeting? A. I probably asked Mr. Ronay how these rods performed, the new rods, and he said very much better than anything they had had, and

276

that the coating which we had applied seemed to solve, at least, the major problem of the breakage, and expressed some surprise that he hadn't thought of it first.

&ast; &ast; &ast; &ast; &ast; &ast;

"216DQ. I show you a letter dated September 10, 1942 and which appears as part of Ronay's Exhibit 2, and ask you whether or not you received that letter? A. Yes, I did.

"217DQ. And I also call your attention to Ronay's Exhibit 20, and ask you whether or not that is the sketch which was enclosed with the September 10, 1942 letter? A. Yes, I think it is.

"218DQ. And in this letter the Experimental Station was asking for the price and delivery date for certain materials that are specified in the letter? A. Yes.

"219DQ. And what did you do about the matter? A. I referred that to Niagara Falls because we, in our section, were not authorized to quote prices.

"220DQ. And what was done in regard to the inquiry? A. I don't recall that we furnished any of the sprayed materials. We may have supplied them straight through, but I don't think we furnished that type of spray.

"221DQ. By 'That type of spray' you refer to the type shown in Figure 2 of Exhibit 20? A. Yes.

"222DQ. Now by this letter of September 10, 1942, do I understand that they were asking for prices on annealed but uncoated electrodes and also spray-coated electrodes? A. Yes.

"223DQ. What sort of spray-coating did you understand was being asked for? A. According to specifications it calls for bronze, which I do not know whether we were in a position to furnish at that time or not."

The testimony given by Barba was supported in detail by the testimony of Hediger, Pfaffenbach, and Courter, all four of whom were still in the employ of the Carborundum Company at the time of their depositions. The testimony of Ronay and Jensen was supported by the testimony of John H. Eastman and Marcel Weideman, employees of the Naval Station Welding Laboratory, who operated the tests with the electrode in the underwater cutting and who participated in making the records thereof.

The testimony given in behalf of Ronay and his witnesses is completely documented by official correspondence and records from the files of the Navy Department, including the diary kept by Jensen in the regular course of business at the welding laboratory. Ronay's story was told by him and his witnesses after the refreshment of their recollection from their current documentary evidence. Hediger likewise relied on some of the official correspondence introduced by Ronay, and certain excerpts from Barba's diary, but otherwise offered no contemporaneous records to support or substantiate the testimony of himself and witnesses given by them from memory after a lapse of six years.

The Board of Interference Examiners held that Hediger conceived the invention of the counts on July 22, 1942, and subsequently imparted it to Ronay, on the basis that while "The testimony in behalf of Hediger is insufficient to establish the date of the conference of Barba, Hediger and Courter, and thus the date of the conception of the invention by Hediger," nevertheless there were other circumstances from which it may be assumed that the conference was so held and its result carried out as hereinbefore described by Barba because, as the board further held, "Ronay did not testify that he was the originator of the spray-coating idea. He must have seen or been informed in some manner that spray-coated rods would be satisfactory for his purpose to give a basis for his ordering the spraying department [of the Naval Station] to spray-coat some rods on August 29, 1942."

Excerpts from the decision of the board establish that it based its primary conclusion on the premise that Ronay nowhere in the record affirmatively alleged "that he was the inventor of the subject matter here in issue." Whether a third party is in fact the inventor of the subject matter of the counts of an interference is not a proper question to raise in such an

interference.[2] Even so, the record discloses that Ronay testifying under oath explained how and when he came to make the invention, and was cross-examined on that point by counsel for Hediger; that Ronay filed the patent application here involved and made the oath therein that he was the inventor of the claimed subject matter.

An applicant's oath is evidence that he asserts authorship of the subject matter claimed as his invention.[3] Nowhere in the record is there any evidence whatever which tends to establish that Ronay did not fully comprehend the nature of his responsibility in making the oath or that he did not fully meet his obligation within the letter and spirit of the law. That he had no motive to do otherwise, is evident from his stipulation to contribute the invention to the Government without reservation of royalties thereon to himself.

Finally, it may be noted, that one who files an application for a patent and makes the necessary and regular oath thereto, as was done by Ronay in the instant case, is presumed to be the inventor of the claimed subject matter and entitled to the invention where there has been no abandonment of the application and where there is no evidence to overcome such presumption.[4] Ronay has continued to assert his authorship of the invention of the counts: "Q. 54. After you submitted your request for a patent application, did you ever abandon the idea or abandon your efforts to obtain a patent application? A. No, sir. I have furnished additional information to the Judge Advocate's Office—the Office of the Judge Advocate General.

The Board of Interference Examiners in its decision correctly held that in an interference proceeding, "one who claims the benefit of the work of another must show that he communicated to the one who did the work an idea of specific means

for accomplishing the desired end," citing McKeen v. Jerdone, 34 App.D.C. 163.

Ronay and his aides in the welding laboratory at the Naval Station labored with eager perseverance for more than six months to complete the development of the electrode here in issue. During that time they persistently called upon the Carborundum Company and its officials, by correspondence, telephone, and by personal contact, for some suggestion for accomplishing the desired end of which the company and its officials had been fully advised.

However, as correctly pointed out in the brief of counsel for Ronay, there is no competent evidence that the Carborundum Company, as interested and promptly cooperative as they allegedly were in the success of Ronay's assignment, made any suggestions whatever throughout the long course of the research conducted by Ronay.

Based upon a series of various assumptions, the board assumed and held, in effect, if not directly, that the spray-coated rods which completed the invention were shipped in fact by Barba and received by Ronay in July of 1942, and were thereafter successfully tested under his supervision at the Naval Station prior to August 29, 1942, which fact on that date was personally acknowledged by Ronay to Barba; or if the rods were not so shipped, tested and acknowledged, as hereinbefore described, then Barba on the occasion of his visit on August 29, 1942, as the board again assumed and held "if Ronay had not received the rods or had not heard of spray-coating rods it would only be a human trait for Barba to explain the method to him."

No record of the alleged shipment of the spray-coated rods was produced in evidence. On that point, on cross-examination, Barba testified:

"285XQ. Now you stated that you shipped the rods from Philadelphia. Do

2. Mabon v. Sherman, 161 F.2d 255, 34 C. C.P.A.,Patents, 991; Rava v. Charlton, 104 F.2d 798, 26 C.C.P.A.,Patents, 1398; Wintroath v. Chapman, 47 App.D.C. 428, 432.

3. Kremer v. Harsel, 288 F. 267, 53 App. D.C. 61. And see Precision Instrument

Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 815, 816, 65 S.Ct. 993, 89 L.Ed. 1381.

4. Kremer v. Harsel, 288 F. 267, 53 App. D.C. 61.

you have any record of that shipping? A. I doubt it very much. That was shipped from the Philadelphia office. That was 1942. I doubt that those records exist.

"286XQ. I believe you had said previously that you had the rods packed for shipping to you in Philadelphia? A. No, I took them down with me to our Philadelphia warehouse where our office was located and had the warehouse man pack them for shipment down to Annapolis out of the Philadelphia warehouse, and I don't recall how many rods there were."

The undisputed testimony of Jensen and Ronay established that during the time in question, which was during the war, all shipments of materials came through the receiving department of the Naval Station, and a record was made of each; that no record of the alleged shipment could be found after a special search by Ronay; and that the records of the shipping department were still available. On the point in issue, both Ronay and Jensen flatly denied any knowledge of the receipt of such rods, or knowledge of the disclosure of the invention which was alleged to have been conveyed to them by such rods or by Barba in person.

Jensen, whose diary covered the period and tests now in question, testified, among other things, on direct examination:

"By Mr. Wohlfert:

"Q. 4. Do you recall having received or tested the rods referred to by Mr. Barba? A. No, I have no recollection whatsoever, and I don't see any entries in here to that effect, to the effect that any were received. That would be quite an event, and I am sure I should have noted it.

"Q. 5. Do you recall having discussed the matter with Mr. Barba upon the occasion of his visit, that is, discussed the success of the rods allegedly furnished by The Carborundum Company? A. Not until the date September 5. At that time we made our first note here that the globar spray coating was promising, and it was in late August then that we sent in our

orders for spraying. I have no knowledge of spray coating prior to that date."

Jensen testified that he "tried religiously to record the important events" throughout the entire course of the development in issue and it is apparent that he succeeded to an eminent degree. The following excerpt from the record on the examination of Jensen by Mr. Wohlfert is deemed pertinent:

"Q. 94. Referring back to Exhibit 4, which was your notes concerning the visit of Mr. Barba on July 13, 1942, you stated that item 3, being the Globar with the brass sleeve, was one of the items that was discussed with Mr. Barba at that meeting. Do you recall at any of the conferences with Mr. Barba or any other representative of the Carborundum Company that he or they had ever mentioned that any employees of the Carborundum Company had independently invented and developed a metal coated Globar electrode for underwater cutting purposes? A. No, I heard no such statements.

"Q. 95. Had Mr. Barba or any other member of the Carborundum organization ever disclosed to you or to Mr. Ronay, to your knowledge, the idea of coating electrodes with metal? A. No.

"Q. 96. So far as you know personally, this invention originated at the Naval Engineering Laboratory? A. It did.

* * * * * *

"Re–D. Q. 97. Who had supervision over the performance or conduct of tests you made, Professor? A. I had the immediate supervision and kept in very close touch with the work even though I was not actually the notekeeper at the time of the test. I was not always present when all of the tests were run but I kept very close watch over them.

"Re–D. Q. 98. With reference to the diary, are we to conclude that because some of the entries are rather brief that they may therefore not be accurate? A. No, it would not be correct to conclude that. As I mentioned before, the notes were terse and were basically for myself. However, I never made an entry unless there was real meaning behind the entry."

The testimony of both Jensen and Ronay was subjected to the most critical cross-examination but has stood up throughout. The following excerpt from the record relative to Ronay's cross-examination by Mr. Harlan is deemed pertinent:

"X-Q. 42. [Repeating a question.] I will try to simplify it. Since you had no personal contemporaneous record of events, your information must be derived from what is in the record here, with perhaps some material that is not in the record, of the official test results and Mr. Jensen's diary, is that correct? A. Not quite. There is an additional source of information, and that is the test records.

"X-Q. 43. Well, we have a great many of the test reports in the record already. The fact that Mr. Jensen's diary does not record the receipt of these rods, since you have no independent means of refreshing your recollection on that point, it may possibly have been that those rods were received and that it escaped your memory? A. No, sir. There would have been another source of information. If the rods would have been received, we certainly would have tested them. I found no evidence of ever having tested any material at that time that was sprayed at and by Carborundum.

"X-Q. 44. And you are prepared to state unequivocally that your test records are absolutely complete? A. As far as practicable, yes."

There is definitely no basis in the record for the assumption that Jensen omitted from his diary some things that amounted to a whole development, such as the testing of spray-coated electrodes, had that taken place, at the Naval Station prior to August 29, 1942. That matter has been covered fully by the testimony of Jensen hereinbefore set forth.

It is always possible, of course, to take a few words here and there from the context of the report of a major occupation and from the excerpts thus isolated arrive at a conclusion totally at variance with the weight of the evidence as a whole. That is particularly true in the case at bar.

There is merit, however, in the contention or suggestion of counsel for Ronay, that Barba was frequently in and out of the plant of the Carborundum Company at Niagara Falls over an extended period; that whenever he went there the superintendent of the assembly line, Pfaffenbach, was "struck with something to do"; that the work of spray-coating of rods of Globar continued there even up to the date of the taking of testimony; that the visit of Barba to the Naval Station on August 29, 1942, doubtless related to the annealed rods, ordered in Ronay's letter of July 13, and which were shipped by Carborundum and tested at Annapolis in the earlier part of August of 1942; and that the spray-coating of the rods relied on by Hediger and his witness might have reasonably related to the activities of late September and the latter part of 1942 or of 1943, when the two institutions here concerned were negotiating for a supply of the rods for the use of the Naval Station and an effort was being made by them to bring the price down.

In any event, Hediger has failed to show by any degree of acceptable proof that he communicated to Ronay, the man who did the work, and who had first hand knowledge concerning the involved problems and the behavior of the Globar rods, the idea of the specific means for accomplishing the desired end. Accordingly, upon all the facts appearing, we are of the opinion that derivation of the complete invention from Ronay by Hediger admits of no reasonable doubt.

The decision of the Board of Interferences Examiners, for the reasons hereinbefore stated, is reversed.

Reversed.