56 CCPA
**Morton S. DeGROFF, Appellant,**

v.

**Daniel D. ROTH and Robert M. Hall, Appellees.**

**Patent Appeal No. 8155.**

United States Court of Customs and Patent Appeals.

July 24, 1969.

George B. Newitt, Chicago, Ill., Jacques M. Dulin, Deerfield, Ill., Bair, Freeman & Molinare, Chicago, Ill., for appellant.

Eugene F. Buell, Buell, Blenko & Ziesenheim, Pittsburgh, Pa., for appellees.

Before RICH, Acting Chief Judge, DURFEE and NEESE, Judges, sitting by designation, ALMOND and BALDWIN, Judges.

BALDWIN, Judge.

This appeal by the senior party DeGroff is from a decision of the Board of Patent Interferences awarding priority of invention of the two counts in interference No. 94,868 to the junior party, Roth and Hall. DeGroff is involved through patent No. 3,128,079, granted April 7, 1964 on his application filed March 4, 1963 [1] and assigned to The Aro Corporation. Roth and Hall are involved on the basis of an application [2] filed November 20, 1963. That application was filed on behalf of Hall and himself by Roth alone and accepted by the Patent Office under its Rule 47 (a) upon it being demonstrated that the alleged co-inventor Hall refused to join therein.

The appeal involves the question of originality of invention. It is our conclusion that the board erred in finding that Roth and Hall met their burden of proving DeGroff derived the invention in issue from them and that its decision must therefore be reversed.

### The Invention in Issue

The contested invention relates to a surgical turbine or tool used for cutting and shaping bone and is defined in counts 1 and 2, corresponding to claims 1 and 2 of the DeGroff patent:

> 1. In a surgical turbine, an elongated housing of a size suitable to be held pen-like in the hand, means for supplying fluid pressure to one end of said housing, a collet at the other end of said housing for the reception of the shank of a surgical bur or the like, a shaft, bearings journaling said shaft in said housing for rotating said collet,

---

1. Serial No. 262,665.

2. Serial No. 328,772.

said collet being mounted on the outer end of said shaft, a turbine wheel on said shaft for rotating the same, means for directing fluid pressure to the vanes of said turbine wheel including a control valve, a brake for said shaft comprising a friction applying element longitudinally movable with respect to said housing and normally biased to engage the inner end of said shaft, a brake release element movable transversely of said housing, and a control lever pivoted at one end to said housing and extending longitudinally thereof so that index finger pressure may be applied thereto as said housing is held in the hand, said control lever upon initial depression cooperating with said brake release element and thereafter upon further pressure cooperating with said control valve to open it in proportion to the degree of pressure applied to said control lever.

2.  In a surgical turbine, an elongated housing of a size suitable to be held pen-like in the hand, means for supplying fluid pressure to one end of said housing, a collet at the other end of said housing for the reception of the shank of a surgical bur or the like, a shaft, bearings journaling said shaft in said housing for rotating said collet, a turbine wheel on said shaft for rotating the same, means for directing fluid pressure to the vanes of said turbine wheel including a control valve, a normally applied brake for said shaft, and a control lever pivoted at one end to said housing and extending longitudinally thereof so that index finger pressure may be applied thereto as said housing is held in the hand, said control lever upon initial depression cooperating with said brake to release the same and thereafter upon further pressure to open said control valve in proportion to the degree of pressure applied to said control lever, said shaft being provided with an additional turbine wheel, and a turbine stator between said turbine wheels, said stator supporting one of the bearings for said shaft.

The elements of the counts are illustrated in enlarged sectional view in Fig. 1 of the DeGroff patent, shown below:

FIG. 1

A housing H, consisting of a body 10 and a pair of sleeves 12 and 14, is of a size adapted to be held in the hand like a pen.  Sleeve 12 has a shank 16 extending therefrom within which is a bur-holding collet 18 formed on one end of a turbine shaft 20.  The shaft 20 is journaled in ball bearings 21 and 23 and has primary and secondary turbine wheels 22 and 26, respectively, mounted thereon. A stator 30 located between the turbine wheels engages an internal shoulder 31 of the sleeve 12 and is held in position thereon by means including a spacer sleeve 33 and a nozzle plate 34.  At the end of the housing opposite the collet is an inlet 38 for pressure fluid, the flow of which is controlled by a valve 40 biased by a spring 48 to closed position against seat 44.  A braking element 50 for shaft 20 is provided in the form of a metal plug slidable longitudinally in the housing H and normally biased to braking position engaging the end of shaft

20 by a spring 52. A brake release element 54 is slidable laterally of the housing and has a cone-shaped portion 56 adapted to enter a cross bore 58 of the braking element. A control lever 66, pivoted at 68, extends longitudinally of the housing to coact with the brake release element 54 and valve stem 42.

Normally the parts of the device are in the position illustrated with the braking element 50 frictionally engaging the end of shaft 20 and the valve 44 closed. With the tool held in the hand like a pen by the surgeon or dentist, initial movement of the control lever 66 causes the cone-shaped portion 56 of the brake release element 54 to move downwardly to move the brake element 50 away from the end of the shaft 20 and release it. Further downward movement of the control lever maintains the brake in released condition and opens the valve 44 to permit pressure fluid to operate the turbine and thereby rotate the shaft 20 and collet 18 at a speed depending upon the degree of opening of the valve. Release of the control lever first closes the valve 44 and then allows the braking element 50 to engage the end of the shaft 20 and quickly stop its rotation.

### The Evidence

The evidence for the party Roth and Hall consists of the deposition of Roth and accompanying documentary exhibits. Depositions of DeGroff and Roth's co-applicant Hall, with accompanying affidavits, were submitted on behalf of the party DeGroff.

It is uncontradicted that Roth, who had a dental tool repair business, and Hall, a dental surgeon, formed Surgi-Drill, Inc., in 1961 and worked together in Pittsburgh in the development and sale of dental and surgical equipment. They developed a control and supply unit for certain equipment known as a Weber drill and filed a patent application on the unit on May 26, 1961.[3] Roth and Hall felt that better equipment than the Web-er drill could be produced and contacted several manufacturers without succeeding in getting anyone to make them a dril of the type they wanted.

On January 2, 1962, Roth and Hall visited Aro Corporation and there met with Jackson, Hitt and Zwayer of that organization. Roth and Hall took with them a Weber drill or handpiece which they showed to the representatives of Aro and they described certain modifications and specifications which they desired. The Aro representatives showed Roth and Hall an air driven grinder being sold as Aro No. 7980 (Roth Exhibit 30) and the matter of miniaturization and modification of that grinder for use in the new instrument was considered. As a result of this meeting, Aro prepared a Development Project Authorization or DPA (Roth Exhibit 6A, B) which authorized an expenditure of $500.00 for a "layout proposal and possibly detail drawings" for a tool. The DPA included a list of ten desired conditions as follows:

1. Entire tool and hose (threaded into inlet of tool) will be subjected to sterilization by autoclave methods.

2. Tool outer diameter to be approximately ¾″ maximum. Nose diameter should be tapered smaller if possible for visibility of burr. Overall length should be between 5″ and 6″.

3. Operating pressure—40 PSIG.

4. Collet to be as small as possible for one size (³⁄₃₂) shank only and to be of quick change design without wrenches if possible.

5. Throttle to be of lever style and will be operated by the index finger when tool is held in the manner a writing pencil would be held.

6. Weight to be kept to an absolute minimum—aluminum may be used extensively because tool will not be subjected to abuse.

7. Tool will receive *no* lubrication and a minimum bearing life of 100 hrs. will be acceptable. Bearings need

---

3. That application issued as U. S. patent No. 3,216,442 on November 9, 1965 to Roth and Hall but is not involved here.

not be grease filled and sealed if they will provide this minimum life. Tool will run a maximum of 15 minutes per day with a maximum burst length of 5 minutes, after which time tool will probably be sterilized prior to another surgical procedure.

8. Major portion of exhaust air should be directed rearward preferably at the rear of the tool. A small quantity of air (either live air or exhaust) should be directed onto the cutting burr to keep from burning and thus killing the bone cells.

9. Tool should run free in the 70,-000 to 100,000 RPM range.

10. Pork bones may be used for experimental conditions in testing the tool. Burrs should be of $\frac{1}{8}$ cutting diameter maximum and should be obtained from Dr. Hall if project reaches that state of development.

The DPA was given to DeGroff by Hitt, his superior, who advised him of the meeting of Roth and Hall with Aro. DeGroff then prepared a drawing of a tool (Roth Exhibit 8) incorporating various features on the DPA list which was submitted to Roth and Hall, along with a non-operating mockup, in early February of 1962 for comment. Roth and Hall reviewed the drawings and asked that certain changes be made, including the addition of a brake or, at least, means for stopping the tool.

Aro then sent Roth and Hall a second drawing dated February 14, 1962 prepared under DeGroff's supervision (Roth Exhibit 11) along with a letter from Hitt stating that the drawing incorporated the ideas suggested by Roth and Hall. The drawing includes a brake and, except for the type of collet, the structure of which is not involved in the counts, shows essentially the device in issue. Communication continued between Aro and Roth and Hall on the

matter and sometime after early April of 1962, Aro sent Roth a prototype of the device for which Aro was paid $250.-00. Further exchanges relative to the tool and its operation took place through October of 1962.

In November of 1962, Roth and Hall separated and settled their interests in Surgi-Drill, Inc., pursuant to an agreement termed the "Sutton" agreement (Roth Exhibit 23). Hall became sole stockholder of Surgi-Drill and Roth participated in forming Porta-Drill, Inc. to compete with Surgi-Drill. The agreement specified that Hall and Roth would have "joint, equal rights to the new project under development at the behest of Hall and Roth by Aro Manufacturing Company and that all patent applications filed by or in the name of either to the product being so developed shall inure to the joint benefit of Hall and Roth."

In a letter dated December 19, 1962 (Roth Exhibit 25), received by Hall, Aro stated that Hall was appointed "consultant and technical director" for their "air Turbine Surgical Tool Program [sic]" effective December 1, 1962. Hall testified that he was not paid for services in behalf of Aro. However, the device of the counts, generally designated the "Hall Air-Drill" or "Hall Surgairtome," has been manufactured by Aro and sold to Surgi-Drill and its successor, R. M. Hall Corporation, solely owned by Hall, for wholesale at a substantially higher price.[4]

Roth eventually moved to California in February of 1963, assigning his interests in Porta-Drill to one Carl Citron. Subsequently, Citron filed a civil action against Aro in the U. S. District Court for the Western District of Pennsylvania, charging a breach of confidential relationship. A verdict favorable to Aro was reached in the District Court but that verdict was overturned by the Court of Appeals for the Third Circuit in an opinion filed May 11, 1967 and a new trial was ordered.

---

4. Hall's testimony includes the following:
XQ36. Yes. Could you tell us what price you pay Aro Corporation for the Hall Surgical Drill—A. Based on quantities of five hundred I receive them at $175.

XQ37. Now, could you tell us at what price you sell those? A. I sell some $319.

## The Board's Decision

The board observed that the District Court verdict favorable to Aro in the Citron suit was then on appeal and that the verdict was based on a different record [5] and concluded that the question of originality involved here should be considered solely on the interference record.

The board observed that Roth and Hall, in order to prevail, must prove by a preponderance of the evidence that they "had a full concept of the invention encompassed by the counts and this concept was transmitted to DeGroff." It then stated:

> Although we have no corroborated evidence as to who specified the ten items in the DPA we do not believe it is improper to conclude that these items originated with Roth and Hall since they came to Aro to have a tool built to suit their purpose.

It further found that DeGroff made the drawing of Exhibit 8 from the design criteria of the DPA and that the device shown in that drawing is obviously a modification of a prior commercial Aro tool, accomplished by miniaturizing it and changing a rotary valve therein to a reciprocating valve operated by a lever.

The board further observed that the question arose whether the suggestions of Roth and Hall amount to a complete conception of the invention or whether the invention was conceived by DeGroff. In concluding that "the concept of the complete combination originated with Roth and Hall, and was transmitted to DeGroff," the board reasoned:

> Broadly the counts require (1) elongated housing to be held pen-like in the hand, (2) fluid supply means at one end, (3) a collet at the other end, (4) a turbine, (5) a brake, (6) a pivotal control lever.

> We cannot find any clear evidence of conception of the whole invention by DeGroff. The earliest date alleged by him in his preliminary statement is February 14, 1962 which date is subsequent to the meeting at Aro with Roth and Hall.

DeGroff in his testimony admits that he made the first drawing (Exhibit 8) in attempted conformance with the DPA which we have concluded embodied the suggestions of Roth and Hall. Furthermore DeGroff admits that the modifications made in the device of exhibit 11 did not originate with him (DR 54). We further note that Aro was not in the business of manufacturing surgical tools nor is there any evidence of intent to manufacture surgical tools of their own conception, prior to the meeting with Roth and Hall.

It is true that DeGroff supplied the detailed knowledge and Roth and Hall disclaim the details.

However we do not believe that the details are any more than what a skilled designer such as DeGroff would supply once having been told what was desired. The detailed structure would inure to the benefit of the one who had the conception of the overall combination. Compare Agawan Woolen Company v. Jordan, 7 Wallace 583 [74 U.S. 583, 19 L.Ed. 177 (1868)].

## Opinion

■ Roth and Hall, as junior party, have the burden of proving that DeGroff derived the invention in issue from them. A general expression of the nature of that burden is set out in Ronay v. Hediger, 189 F.2d 269, 38 CCPA 1074 (1951), as follows:

> * * * one who claims the benefit of the work of another must show that he communicated to the one who did the work an idea of specific means for accomplishing the desired end.

This being a case where Roth and Hall instigated the activity that terminated in the development of an operative embodiment by DeGroff, consideration must also be given to the following test for a

---

5. It does not appear that the testimony in the civil action was introduced into the record of the interference.

suggestion to constitute conception or "invention" as stated by the Supreme Court in the leading case of Agawan Woolen Co. v. Jordan, cited in the quotation immediately above from the board:

Suggestions from another * * * must have furnished such information to the person to whom the communication was made that it would have enabled an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation.

■ We think that the subject matter of the DPA may properly be credited to Roth and Hall under the circumstances here, particularly in view of the failure of DeGroff to introduce testimony of his superior Hitt, who acted as intermediary between Roth and Hall on one hand and DeGroff on the other. We also think that Roth and Hall may be credited with the suggestion that a brake be provided.

However, it appears to us that the board oversimplified the requirements of the counts in concluding that Roth and Hall had a full conception of them and transmitted such to DeGroff. Among the details that become significant here are the particular brake structure recited in count 1 and the requirements in both counts of a particular cooperation of the control lever with both the brake release element and the control valve for the fluid pressure. More specifically, count 1 requires a brake "comprising a friction applying element longitudinally movable with respect to said housing and normally biased to engage the inner end of said shaft [the shaft which is rotated by the turbine to rotate the collet and surgical bur received in the latter]." Also required, in terms of count 2, is a relationship resulting in "said control lever upon initial depression cooperating with said brake to release the same and thereafter upon further pressure to open said control valve in proportion to the degree of pressure applied to said control lever." As the board apparently recognized, the evidence does not show that Roth and Hall conceived of the structure in such

detail. Neither do we find, and it is here that our principal disagreement with the board lies, any convincing evidence that the information which Roth and Hall may be credited with transmitting to DeGroff was such that, in the language of Agawan, "it would have enabled an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation." The board may have been influenced by the fact that DeGroff actually did supply the details in question in concluding that they were not "any more than what a skilled designer such as DeGroff would supply once having been told what was desired" but the criterion is not merely what DeGroff actually did but whether what he did was within the ordinary skill of a mechanic.

Hall and Roth urge that DeGroff admitted in his testimony that "given the concept of incorporating a brake, it would be merely a matter of design for the particular drill package and any mechanical engineer could choose one for the particular package." However, we do not think the DeGroff testimony amounts to an admission that the particular brake structure recited in count 1 could have been provided by "an ordinary mechanic, without the exercise of any ingenuity and special skill on his part."

It is true, as additionally urged by Roth and Hall, that the "concept of a finger tip control lever extending longitudinally of the housing" was disclosed in the DPA. However, the disclosure was of such lever as a throttle only and not as a control for the brake also, much less as a means for providing the particular cooperative relationship of throttle and brake defined in the counts.

Roth and Hall, as a party to the interference, refer to the arrangements financially advantageous to Hall which Aro made for selling the drills of the invention and to the fact that Aro designated the drill as the "Hall Surgical Turbine" as circumstances to be considered. They also point to uncontradicted testimony

that Hall proposed to pay Roth to testify favorably to Aro. However, the sole issue here is inventorship and that must be determined on the basis of the nature of the disclosure that the record shows was made to DeGroff by Roth and Hall. On such basis, we must conclude that derivation by DeGroff was not shown for the reasons already pointed out.

The decision is reversed.

Reversed.