**GAMBRO LUNDIA AB,**
Plaintiff–Appellant,

v.

**BAXTER HEALTHCARE CORPORATION Defendant/Cross–Appellant.**

Nos. 95–1530, 96–1004.

United States Court of Appeals, Federal Circuit.

April 8, 1997.

Willem G. Schuurman, Arnold, White & Durkee, Austin, TX, argued, for plaintiff–appellant. With him on the brief were Michael S. Metteauer and Mark B. Wilson.

Timothy J. Malloy, McAndrews, Held & Malloy, Ltd., Chicago, IL, argued, for defendant/cross–appellant. With him on the brief were Robert C. Ryan, Gregory J. Vogler, and John S. Artz. Of counsel on the brief was Charles R. Mattenson, Baxter International, Inc., McGaw Park, IL.

Before ARCHER, Chief Judge, LOURIE, and RADER, Circuit Judges.

RADER, Circuit Judge.

In this patent infringement case, Gambro Lundia AB (Gambro) appeals and Baxter Healthcare Corporation (Baxter) cross-appeals a final judgment of the United States District Court for the District of Colorado. The patent at issue, U.S. Patent No. 4,585,-552 ('552 patent), claims a "system for the measurement of the difference between two fluid flows in separate ducts." This invention recalibrates sensors during hemodialysis to accurately measure the impurities removed from a patient's blood. Due to error in the district court's analyses of invalidity, unenforceability, and infringement, this court reverses.

## BACKGROUND

Hemodialysis, commonly called dialysis, removes contaminants and excess fluid from the patient's blood when the kidneys do not function properly. Hemodialysis works by passing a dialysate solution through a machine, called a dialyzer, which functions as an

artificial kidney. In the dialyzer, the dialysate passes on one side of a porous diffusion membrane, while the patient's blood passes on the other side. Because of the pressure differential across the membrane, blood contaminants and excess fluid diffuse through the membrane from the patient's blood into the dialysate. These impurities diffused from the patient's blood are known as ultrafiltrate.

After hemodialysis, the volume of the dialysate is greater. The difference between the initial and end volumes of dialysate can be used to calculate the amount of the ultrafiltrate removed from a patient's blood. This calculation is critical to the success of hemodialysis. Removal of too much or too little ultrafiltrate may lead to severe medical problems or even death.

Repgreen Limited (Repgreen), a British bioengineering company, improved ultrafiltrate calculation. Keith Wittingham, Repgreen's chief designer, introduced the Repgreen monitoring system, the UFM 1000, in late 1977. Wittingham's development relied on the research of Professor Michael Sanderson. The UFM 1000 used two electromagnetic flow sensors to measure the difference between the rate of dialysate flow into and out of the dialyzer. The difference in flow rates indicated the quantity of ultrafiltrate leaving the system. To calibrate the system for an accurate measurement of dialysate flow rates, the operator would direct clean dialysate through both sensors before dialysis. This calibration method, however, could not account for clogging in the outflow sensor during dialysis. Over time, the ultrafiltrate would build up behind the outflow sensor and disrupt the accuracy of the measurements. Experts refer to this increasing inaccuracy as "drift."

In the late 1970s, Gambro sought to improve ultrafiltrate monitoring. During 1979, Wittingham met with Gambro engineers on two occasions to discuss Repgreen's development of an ultrafiltrate monitor for Gambro. In July 1979, after Repgreen went bankrupt, Gambro purchased Repgreen's hemodialysis technology, including the rights to the UFM 1000 monitor. After acquiring Repgreen's technology, Gambro's research team worked for three years on improving ultrafiltration monitors. In June 1982, four Gambro engineers, including Bengt–Ake Gummesson, refined the monitoring system. Their invention ultimately issued as the '552 patent.

Gambro filed its initial patent application in Sweden on September 28, 1982. Gambro followed up with a U.S. application in September 1983. Gunnar Boberg, Repgreen's in-house patent counsel, and Arnold Krumholz, Repgreen's U.S. patent counsel, prosecuted the U.S. application. The examiner rejected claim 1 as anticipated by a German patent application (German '756). In response, Gambro provided the examiner with a German-language copy of German '756, along with arguments prepared by Boberg (who is fluent in German). Based on this submission, the examiner withdrew the rejection. The '552 patent issued on April 29, 1986.

The Gambro invention uses valves to direct clean dialysate around the dialyzer to recalibrate the sensors during dialysis. The invention's valve system can direct clean dialysate through the first flow sensor, around the dialyzer, and through the second flow sensor. To recalibrate, the invention momentarily blocks passage of contaminated dialysate through the outflow sensor. Instead, clean dialysate flows through the outflow sensor and recalibrates the detectors with the same clean dialysate flowing through both intake and outflow sensors. After the brief recalibration, the hemodialysis continues with contaminated dialysate flowing through the second sensor. Claim 1 of the '552 patent reads:

In dialysis equipment including a dialyser, a system for measuring the difference in the rate of flow between first and second fluid streams, said first fluid stream comprising clean dialysis solution flowing to the dialyser and said second fluid stream comprising spent dialysis solution flowing from the dialyser, said system comprising

a first duct for receiving said first fluid stream flowing therethrough,

a second duct for receiving said second fluid stream flowing therethrough,

measuring means for measuring the difference in the rate of flow between said

first and second fluid streams within said first and second ducts,

■ and transferring means for preventing the flow of said second fluid stream through said second duct while flowing said first fluid stream through both said first and second ducts without passing said first fluid stream through the dialyser and without altering said rate of flow of said first fluid stream between said first and second ducts such that said rate of flow of said first fluid stream through said first and second ducts is substantially equal,

■ whereby the measured difference of the rate of flow of said first fluid stream flowing through said first and second ducts is adaptable as a reference.

(Paragraph enumeration added.)

In 1984, Baxter acquired the dialysis equipment division of Extracorporeal, Inc. Dissatisfied with the accuracy of the Extracorporeal technology, Baxter developed the Baxter SPS 550 and began marketing the device in December 1987. Gambro filed suit against Baxter in the District Court for the District of Colorado in March 1992 claiming the Baxter SPS 550 infringed the '552 patent. In defense, Baxter asserted the invalidity and unenforceability of the '552 patent.

After a ten-day bench trial on the issues of infringement, validity, and unenforceability, the district court held claim 1 of the Gambro '552 patent invalid for obviousness and derivation, and unenforceable for inequitable conduct. The district court also entered judgment in favor of Baxter on infringement, contributory infringement, inducing infringement, and willful infringement due to the invalidity and unenforceability of the '552 patent. Further, the district court declined to award either party attorney fees or costs.

## DISCUSSION

### I. *Derivation*

■ The trial judge found that Gambro had derived the '552 invention from a Wittingham proposal left in the files when Gambro acquired Repgreen's dialysis technology. This court reviews a finding of derivation as a question of fact. *Price v. Symsek*, 988 F.2d 1187, 1190, 26 USPQ2d 1031, 1033 (Fed.Cir. 1993). This requires acceptance of the district court's findings unless clearly erroneous

or predicated on an improper legal foundation. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983). To show derivation, the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee. *Price*, 988 F.2d at 1190. This court reviews a determination of prior conception, which must be proven by facts supported by clear and convincing evidence, as a question of law based on underlying factual findings. *Id.* at 1190–92.

■ Turning first to conception, the district court found that Wittingham had conceived the invention no later than July 1979. The court based this finding on Wittingham's testimony and the Wittingham proposal left in the Repgreen file. Although the district court found Wittingham highly credible, an inventor's testimony, standing alone, is insufficient to prove conception. *See Price*, 988 F.2d at 1194. Conception requires corroboration of the inventor's testimony. *Id.*

■ Thus, this court must weigh whether the Wittingham proposal, prepared in 1979, corroborates Wittingham's testimony of conception. The proposal is a four-page document alluding to an ultrafiltration monitor with valves that automatically zero the sensors upon start-up. The proposal briefly discusses the Auto Zero/Start feature:

> To ensure ease of operation the process of shunting the kidney in order to zero monitor will be done automatically on pressing of the start button. This will also initiate the automatic zeroing of unit.

Baxter contends that this document also discloses the concept of recalibration (or zeroing) during dialysis. In support of this contention, Baxter identifies the following passage from the proposal:

> A zero button may also be necessary in order to zero Ultrafiltration Monitor but not start the automatic control (start signal cannot be allowed till 20 minutes after switch on?).

Baxter argues that the only reason to zero the monitor without starting the automatic control is to zero the monitor when it is

already started—in other words, during dialysis.

Baxter's novel interpretation of this single ambiguous passage in the Wittingham proposal, however, lacks sufficient support to corroborate Wittingham's conception testimony. First, the reference is so unclear that even Wittingham conceded that this single sentence does not state expressly the concept of recalibration during dialysis. In fact, the parenthetical within the sentence suggests that the device should not be in use "till 20 minutes after switch on." For this reason, among others, Professor Sanderson, an expert in dialysis whose early research formed the basis of Wittingham's work, testified that one of ordinary skill in dialysis in 1982 would not have understood this obscure passage to disclose recalibration during dialysis. Professor Sanderson noted that the Repgreen monitor needed twenty minutes to stabilize before use. Therefore, this obscure sentence more reasonably suggests the use of the zero button during the pre-dialysis warm-up period.

In addition, the obscure sentence states that depressing the button calibrates the monitor, but does "not start the automatic control." In its ordinary start-up operation, the Repgreen monitor would calibrate the monitor, start the automatic control, and finally automatically begin the dialysis. The reference to "zeroing" before the automatic control phase thus suggests calibration before dialysis, not during dialysis. Further, if Wittingham had conceived of recalibration during dialysis—an important advance in the dialysis art—the four-page Wittingham proposal would surely contain more than a single cryptic sentence memorializing the advance. Accordingly, this court determines that the Wittingham proposal does not corroborate conception.

The only other evidence offered by Baxter to corroborate conception is the testimony of Mr. Smith, Wittingham's supervisor at Repgreen. Referring to the ambiguous sentence, Smith testified that the Wittingham proposal included the idea of calibration during dialysis. The trial judge, however, did not rely on this self-serving testimony in finding prior conception. Moreover, as noted above, the language of the Wittingham proposal itself belies Smith's testimony about

calibration during dialysis. In sum, this court concludes that Baxter failed to meet its burden of proving by facts supported by clear and convincing evidence that Wittingham conceived the invention of the '552 patent.

■ The second prong of the derivation test—communication of the prior conception to the named inventor—poses similar difficulties for Baxter. As an initial matter, the district court applied the wrong legal standard. Citing *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 23 USPQ2d 1622 (Fed.Cir.1992), the district court concluded that Baxter did not need to prove communication of the entire conception, but rather only so much of the invention "as would have made it obvious to one of ordinary skill in the art." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 896 F.Supp. 1522, 1540 (D.Colo.1995) (citing *New England Braiding*, 970 F.2d at 883). Based on this reasoning, the district court applied the obviousness standard in 35 U.S.C. § 103 (1994) to determine that the named inventors received enough information to make the invention obvious to one skilled in the dialysis art. This reasoning, however, misconstrues the dictum in *New England Braiding* and introduces incorrectly an obviousness analysis into the test for derivation.

The Supreme Court announced the standard for finding communication of a prior conception over 125 years ago in *Agawam Woolen v. Jordan*, 74 U.S. (7 Wall.) 583, 19 L.Ed. 177 (1868). The Court required a showing that the communication "*enabled* an ordinary mechanic, without the exercise of any ingenuity and special skill on his part, to construct and put the improvement in successful operation." *Id.* 74 U.S at 602–03 (emphasis added). This court's predecessor consistently applied this Supreme Court standard. *See, e.g., Hedgewick v. Akers*, 497 F.2d 905, 908, 182 USPQ 167, 169 (CCPA 1974) ("Communication of a complete conception must be sufficient to *enable* one of ordinary skill in the art to construct and successfully operate the invention.") (emphasis added); *DeGroff v. Roth*, 56 C.C.P.A. 1331, 412 F.2d 1401, 1405, 162 USPQ 361, 365 (CCPA 1969).

This court recognizes that the district court's incorrect derivation standard springs from dictum in this court's *New England Braiding* decision. In that case, this court noted: "To invalidate a patent for derivation of invention, a party must demonstrate that the named inventor in the patent acquired knowledge of the claimed invention from another, or at least so much of the claimed invention as would have made it obvious to one of ordinary skill in the art." *New England Braiding*, 970 F.2d at 883. This dictum did not in fact incorporate a determination of obviousness into a Section 102(f) analysis. Indeed, this court in *New England Braiding* did not apply such a test.

The *New England Braiding* court upheld the denial of a preliminary injunction because the record showed a likelihood that New England Braiding's patent was invalid under 35 U.S.C. § 102(f). The record showed that George Champlin, the named inventor, worked for the A.W. Chesterton Co. (Chesterton) and participated in experiments that developed the invention. One Chesterton employee testified that Champlin had said, when he left to start his own company, that he wanted to patent the experimental braiding if Chesterton decided not to do so. Champlin denied these allegations. *Id.* at 883–84. The key issue was a credibility determination between the witnesses for the two parties. The sufficiency of the communication, particularly whether the invention was obvious in light of such disclosure, was not at issue. Thus, *New England Braiding* did not incorporate an obviousness test into the § 102(f) analysis.

██ Applying the correct standard— whether the communication enabled one of ordinary skill in the art to make the patented invention—this court discerns insufficient evidence of communication. Wittingham testified that he was not sure that he had discussed calibration during dialysis with anyone at Gambro, and he did not discuss the sensor contamination problem. The trial judge based his finding of communication solely on Wittingham's written proposal. Gambro acquired this document when it acquired Repgreen's technology. During discovery, the proposal appeared in the files of one of the named inventors. However, as discussed above, the proposal does not disclose recalibration during dialysis to one skilled in the art at the relevant time. If the proposal does not disclose recalibration during dialysis, it cannot serve as the basis for a communication of that idea. Thus, under the correct legal standard, the record evidence is insufficient to support a finding of communication. The district court erred in finding communication and conception, and, hence, the finding of derivation is also clearly erroneous.

Because this court reverses the district court's ruling of invalidity based on derivation, it need not reach the issue of correction of inventorship under 35 U.S.C. § 256 (1994).

## II. *Obviousness*

██ This court reviews the ultimate determination of obviousness *de novo*. *See In re Donaldson Co.*, 16 F.3d 1189, 1192, 29 USPQ2d 1845, 1848 (Fed.Cir.1994). This ultimate determination, however, requires underlying factual findings, which this court examines for clear error. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050, 5 USPQ2d 1434, 1438 (Fed.Cir. 1988).

██ The district court determined that the prior art embodied each of the elements of claim 1, with the exception of element five— the "transferring means." Specifically, the court found that the prior art, including the UFM 1000, the DM 358, and the German '756 patent, differed from the Gambro invention only in the absence of computer controlled valves to recalibrate the flow sensors during dialysis. The record amply supports these findings.

Thus, the key obviousness question is whether the prior art would teach one of ordinary skill in this art to employ valves for recalibration during dialysis. The district court found that those skilled in the art were clearly aware of the possibility of recalibrating during dialysis, and that substituting a system of computer-controlled valves for the system of hoses in the UFM 1000 and the DM 358 was obvious to those skilled in the art at the time of invention. However, the

record must provide a teaching, suggestion, or reason to substitute computer-controlled valves for the system of hoses in the prior art. The absence of such a suggestion to combine is dispositive in an obviousness determination. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.,* 859 F.2d 878, 886–87, 8 USPQ2d 1468, 1475 (Fed.Cir.1988).

The trial judge found that the Gray and Sanderson article, *Precision Differential Fluid Flow Measurement,* "clearly suggests using a valve system to bypass or detour clean dialysate around the dialyzer during the course of a dialysis treatment." The record evidence does not support this finding. Sanderson himself testified that his article did not disclose the use of valves to bypass the dialyzer, but actually taught away from that solution. Rather than recalibration by rerouting the clean dialysate through valves around the dialyzer during dialysis, Sanderson testified that his clinical device rerouted spent dialysate, which has passed through the dialyzer, through both the inflow and outflow sensors. Sanderson testified that this configuration was necessary because it was a medical requirement to maintain the flow of dialysis fluid through the dialyzer. Thus, Sanderson testified that his article taught away from recalibration during dialysis by bypassing the dialyzer.

The Gray and Sanderson article supports this testimony. The article and the clinical trials teach that stopping the fluid flow through the dialyzer for recalibration during dialysis is not possible. The article states: "As it was not possible during dialysis therapy to stop the fluid transfer and thus reestablish the zero base line, a series of valves were inserted around the flowmeter to enable the flow to be changed to a zero differential flow configuration while at the same time maintaining dialysis." Further, the article explains that because it was not possible to bypass the dialyzer during dialysis, "[t]he only solution appeared to lie in the adoption of a differential measurement technique where any signal due to the true differential flow could be effectively isolated from that due to the very much larger common mode signal." Thus, Sanderson's use of the valves to direct spent dialysis through both sensors facilitated a proper baseline for testing the accuracy of the improved sensor. Contrary to the district court's finding, the Gray and Sanderson article teaches away from the use of valves to recalibrate during dialysis by bypassing the dialyzer. Without a suggestion or teaching to combine, Baxter's case of obviousness suffers a significant deficiency.

In addition, the district court did not evaluate fully the fourth prong of the obviousness determination—the objective indicia of nonobviousness. These objective indicia, when present, are invariably relevant to a determination under Section 103. *See Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983). These objective indicia "may often be the most probative and cogent evidence [of nonobviousness] in the record." *Id.*

The district court rejected the evidence of long-felt need and declined to address any other consideration. Several objective indicia, however, warrant consideration in this case. For instance, before this litigation, Baxter recognized calibration during dialysis as a significant advance. Baxter touted the advantages of AUTO–ADJUST, as it termed automatic recalibration during dialysis, in the advertising for the allegedly infringing Baxter SPS 550 machines. Baxter's recognition of the importance of this advance is relevant to a determination of nonobviousness. *See Allen Archery, Inc. v. Browning Mfg. Co.,* 819 F.2d 1087, 1092, 2 USPQ2d 1490, 1493 (Fed.Cir.1987).

Additionally, the record contains significant evidence of the commercial success of Gambro's invention. The record shows that Baxter sold over 14,800 dialysis machines allegedly incorporating the Gambro invention since 1987. In fact, Baxter admits that its machines were a commercial success. Of course, the record must show a sufficient nexus between this commercial success and the patented invention. *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.,* 851 F.2d 1387, 1394, 7 USPQ2d 1222, 1226 (Fed.Cir. 1988). The prominence of the patented technology in Baxter's advertising creates an inference that links the Gambro invention to this success.

Finally, the record also suggests that others in this market had tried to solve the need for improved accuracy of the ultrafiltration

monitors. The record reflects that those skilled in the art tried numerous, ultimately unsuccessful, solutions—improving the electronics, improving the flowmeter technology, and recalibrating before dialysis. This objective consideration also supports a conclusion of nonobviousness. *See Graham*, 383 U.S. at 17–18, 86 S.Ct. at 693–94; *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1574–75, 24 USPQ2d 1321, 1333–34 (Fed.Cir.1992).

In sum, the record supplies objective evidence of nonobviousness, including Baxter's recognition of the importance of this invention, evidence of commercial success, and evidence of the failure of others to solve the recognized problem. This objective evidence, combined with the lack of a teaching or suggestion to combine, requires a holding of nonobviousness.

### III. *Inequitable Conduct*

 Inequitable conduct is the failure to disclose material information, or the submission of false material information, during prosecution of a patent with an intent to deceive. *See Kingsdown Med. Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir.1988) (in banc). Under the then relevant standard, information is material if a reasonable examiner would consider the omission or misrepresentation important in deciding whether to issue the patent. *See Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 803, 17 USPQ2d 1579, 1580 (Fed.Cir.1990). A reference which merely replicates references already before the examiner, however, is not material. *See Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1440, 17 USPQ2d 1834, 1839 (Fed.Cir.1991). A finding of inequitable conduct also requires proof of intent to deceive. *Id.* at 1442. The court weighs the intent of the party in light of all evidence, including evidence of good faith. *Kingsdown*, 863 F.2d at 876 (in banc). The quantum of intent evidence necessary for inequitable conduct depends, in part, on the materiality of the information. In the pres-

ence of very material omissions or misrepresentations, less evidence suffices to show intent. *See Halliburton*, 925 F.2d at 1439.

 This court examines a district court's inequitable conduct finding for abuse of discretion. *See Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1420, 10 USPQ2d 1682, 1685 (Fed.Cir.1989). The district court's discretionary finding cannot rest on clearly erroneous findings of fact or on a misunderstanding of the law. *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 551, 16 USPQ2d 1587, 1592 (Fed. Cir.1990) (citing *Kingsdown*, 863 F.2d at 872). The trial judge found that Gambro made fatal misrepresentations to the Patent and Trademark Office about the German '756 patent. This court rejects that finding as an abuse of discretion.

 As discussed above, the examiner rejected Gambro's patent application after his initial examination as anticipated by the German '756 patent.* The German '756 patent discloses a dialysis system with a flowmetric ultrafiltrate measurement. This system manually connects a temporary hose between the intake and outflow sensors (in the position the dialyzer would occupy) to pass the same flow by both sensors. The German '756 patent does not disclose any way to mount the hose and the dialyzer into the dialysis circuit at the same time. Therefore, unlike the patent at issue, the German '756 does not disclose any means for calibrating during dialysis nor any means for preventing the flow of spent dialysis solution through the downstream sensor. Without a "transferring means" recited by the '552 patent to recalibrate during dialysis, the German '756 patent does not anticipate the patented invention.

In response to this rejection, however, Gambro amended claim 1 as follows: "transferring means for *preventing the flow of said second fluid through said second duct while* transferring the flow of the first fluid to said second duct." In distinguishing the amended claims over the German '756, Gambro stated:

---

* Although the German '756 is arguably cumulative prior art over the British Pat. No. 2,003,274 (the Repgreen '274), which was cited in the Gambro patent application, there can be little argument that the German '756 was not material. At the time of these statements, the Gambro patent application had been rejected as anticipated by the German '756. Statements made in answer to this office action are, therefore, material.

In the same way, the measuring cell 9 [of the German '756 patent] is at all times influenced only by the contaminated dialysis solution.... At no time does the German patent transfer the clean dialysis solution, i.e., the first fluid, through the second measuring cell 9, while preventing the flow of the contaminated dialysis solution, i.e., the second solution, from flowing therethrough.

... As noted, the German patent is totally void of any suggestion of providing a dialyzer where the clean dialysis solution is permitted to flow through both the first and second ducts of the measuring cell.

The district court construed these statements as misrepresentations:

I agree that Gambro misrepresented to the patent examiner the teachings of the German patent. Gambro informed the patent examiner that the German patent does not teach a method for transferring clean dialysis solution to the second flow sensor "while preventing the flow of the contaminated solution" to that flow sensor. However, the German '756 patent clearly discloses a means by which a hose can be inserted in place of the dialyzer in order to direct clean dialysate through both the first and second flow sensors. As stated the German '756 patent thus describes a method for transferring the same stream of clean dialysate through both the first and second flow sensors. Further, because the hose directs only clean dialysate through the second flow sensor, the German '756 patent discloses a means for preventing the flow of contaminated dialysis solution through the second flow sensor. Thus, Gambro's statement to the patent examiner that the German '756 patent does not disclose a means to "transfer the clean dialysis solution ... through the second measuring cell 9, while preventing the flow of the contaminated dialysis solution ... from flowing therethrough," misrepresented the German '756 patent's teachings.

(Citations to record omitted.)

This court notes that some of Gambro's responses are at least over-statements. The German reference's down-stream measuring cell is not "at all times influenced only by contaminated dialysis solution" as the district court correctly noted. Nor is it always accurate that "at no time does the German patent transfer the clean dialysis solution ... through the second measuring cell." Instead these statements are only correct in the context of an ongoing dialysis process with a dialyzer, not the hose system, completing the circuit. Of central import, however, is a lack of disclosure in the German reference for bypassing the dialyzer during dialysis, and no disclosure of any means for preventing the flow of spent dialysis solution through the downstream sensor during dialysis. Thus, while Gambro's statements apply during actual dialysis, they are overstatements outside that context. Nonetheless, in the context of Gambro's overall effort to show that the German reference does not anticipate its invention, these exaggerations do not rise to the level of gross falsification.

In any event, inequitable conduct also requires a finding of intent to deceive. As discussed above, all evidence—including evidence of good faith—informs this inquiry. *Kingsdown*, 863 F.2d at 876. In light of the tentative and minor overstatements in this record, the evidence of intent must be relatively strong. *See Halliburton*, 925 F.2d at 1439. On this record, however, the evidence of intent is very weak.

First, Gambro had disclosed British Patent No. 2,003,274 (Repgreen '274) which uses the same pre-dialysis hose procedure as the German '756. In the response to the office action, Gambro specifically stated that German '756 "describes a system which corresponds to the system of the prior art mentioned on page 1 of Applicant's specification." Indeed the '552 specification discloses the Repgreen '274. This disclosure of corresponding prior art to the examiner—in English to boot—shows Gambro's good faith.

Further, the examiner himself had located and cited the German '756 patent, and could consult it while evaluating Gambro's comments in response to his office action. The examiner's access to the German and Repgreen references should have helped place Gambro's comments in their proper context.

The district court, however, overemphasized Boberg's, Gambro's in-house patent counsel's, fluency in German. Although the patent examiner relied on Gambro's translations, the process of moving between lan-

guages is not itself sufficient to show that Gambro exploited its foreign language expertise to deceive the examiner. The examiner may request translations throughout the examination process. *See* Manual of Patent Examining Procedure (MPEP), § 901.05(d) (6th ed.1995).

Finally, the trial judge relied on "Gambro's failure to name Wittingham as the inventor" as corroborating evidence of an intent to deceive. Because Gambro did not derive the '552 invention from Wittingham, this evidence is not available to reinforce an intent to deceive. Thus, the district court's finding of an intent to deceive rests solely on some exaggerations in Gambro's response to the initial rejection and the language superiority of Gambro's counsel. This evidence does not suffice to show the measure of intent necessary for inequitable conduct in the circumstances of this case. Therefore, this court discerns in the district court's determination of inequitable conduct an abuse of discretion.

## IV. *Infringement*

The district court found that the Baxter SPS 550 literally infringed claim 1 of Gam-bro's patent. However, because the district court also found the patent invalid and unenforceable, it entered judgment in favor of Baxter on this issue. With its reversal on the invalidity and enforceability grounds, this court also reverses the judgment on the claim of infringement. Thus, Baxter infringes claim 1 of the Gambro '552 patent. Finally, as this court has reversed the district court and found against Baxter on the issues of invalidity, unenforceability, and infringement, Baxter has not and cannot meet its burden of proving that this case is exceptional, nor that the failure to award costs was an abuse of discretion. Thus, this court declines to address those issues.

## COSTS

Each party shall bear its own costs.

*REVERSED.*